HARRY C. FISHER, Respondent, *v.* STAR COMPANY, Appellant.

**Equity — unfair competition — when courts will restrain use in cartoons, prepared for publication and sale as a business, of imaginary and fictitious characters, and names applied to them, originated and used by the plaintiff in connection with his work as a cartoonist.**

1. A person who uses an unregistered name or mark can prevent others from using the same so as to deceive the public into thinking that the business carried on by such persons and the goods sold by them are his. Such conduct as is calculated to deceive the public into believing that the business of the wrongdoer is the business of him whose name, sign or mark is simulated or appropriated can be restrained in equity. The courts are not confined in the exercise of their equitable powers to preventing unfair competition among the manufacturers of and dealers in goods. The controlling question in all cases where the equitable power of the courts is invoked is, whether the acts complained of are fair or unfair.

2. The principle which interdicts unfair competition in trade will protect a publisher who has imparted to his books peculiar characteristics, which enable the public to distinguish them from books published by others and containing the same literary matter, against the copying of the characteristics though the copyright on the literary matter has expired.

3. Where in an action to enjoin alleged unfair competition in making and publishing cartoons it appears from the findings of fact that the grotesque figures in plaintiff's cartoons, as well as the names applied to them have in consequence of the way in which they have been exploited by the plaintiff and the appearance and assumed characters of the imaginary figures have been maintained, acquired a meaning apart from their primary meaning, which is that plaintiff originated them and that his genius pervades all that they appear to do or say and it further appears that plaintiff is the owner of the proprietary right existing in the characters represented in such figures and names and that they are of his creation, defendant may properly be restrained from using in a cartoon, or in cartoons prepared by others for publication and sale as a business, the same imaginary and fictitious characters and the names applied to them. (*New York Herald Co.* v. *Star Co.*, 146 Fed. Rep. 204; *Outcalt* v. *New York Herald*, 146 Fed. Rep. 205;

*New York Herald Co.* v. *Ottawa Citizens Co.*, 41 Canada Sup. Ct. 229, distinguished.)

*Fisher* v. *Star Co.*, 188 App. Div. 964, affirmed.

(Argued May 5, 1921; decided July 14, 1921.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 7, 1919, unanimously affirming a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

The facts as found at the Special Term are as follows:

" 1. On November 15, 1907, there was published in the San Francisco *Chronicle*, a daily newspaper, a cartoon in the form called a ' comic strip,' which was drawn by Harry C. Fisher and which contained a cartoon character therein named by him and designated ' Mutt.' "

It was the first publication of the cartoon character called " Mutt " and the plaintiff was the sole originator thereof.

" 4. Cartoons in the form of ' comic strips ' containing the character ' Mutt ' and drawn by Harry C. Fisher, continued to be published in the San Francisco *Chronicle* daily, until and including December 10, 1907."

Each of such cartoons so drawn and published contained the word " Mutt " as a designation or name of the said cartoon character.

" 8. On December 11, 1907, and on December 12, 1907 (that is to say, on each of said dates), a cartoon in the form of a ' comic strip ' drawn by Harry C. Fisher was published in the San Francisco *Examiner*, a daily newspaper, and each contained the same cartoon character ' Mutt ' as had been previously published in the San Francisco *Chronicle* and contained the word ' Mutt ' as a name for the said cartoon character."

The said cartoon so published on December 10, 1907, and the cartoons so published on December 11 and 12, 1907, were each duly copyrighted by the plaintiff in his

own name and the plaintiff has never sold or assigned said copyrights or either of them. That the said cartoons of December 11 and 12, 1907, were copyrighted with the knowledge and consent of the publishers of the San Francisco *Examiner.*

"12. Harry C. Fisher continued to publish his cartoons in the form of 'comic strips' in the San Francisco *Examiner* from December 11, 1907, to and including May 12, 1909, between which dates the said 'comic strips' appeared practically daily. .

"13. The first appearance of the cartoon character known as 'Jeff' was in the 'comic strip' drawn by Harry C. Fisher and published in the San Francisco *Examiner*, on March 27, 1908, in which the cartoon character subsequently known as 'Jeff' appears in the said 'comic strip' wherein it is referred to as 'Jeffries.'

"14. The said cartoon character referred to as 'Jeffries' appears again in the 'comic strips' drawn by Harry C. Fisher and published in the San Francisco *Examiner* on March 29, 1908.

"15. On April 1, 1908, the cartoon character previously referred to as 'Jeffries' was also referred to in the 'comic strip' of that date drawn by Harry C. Fisher as 'Jeff.'

"16. Thereafter, that is to say, from April 1, 1908, until May 12, 1909, the cartoon character named and referred to as 'Jeff' frequently appears in the 'comic strips' drawn by Harry C. Fisher and published in the San Francisco *Examiner.*"

The first occasion when the word "Jeff" appeared in the title to a "comic strip" was in the San Francisco *Examiner* on April 4, 1908.

"18. From March 20, 1909, to May 12, 1909, the 'comic strips' drawn by Harry C. Fisher and published in the San Francisco *Examiner* frequently bore both the name 'Mutt' and the name 'Jeff' in the titles thereof. Examples of such titles are the following: March 20,

1909, *Examiner:* ' Mutt gathers $511 and takes Jeff to Dinner. By Bud Fisher;' March 27, 1909, 'Mutt gives Jeff the hook and is back on the block himself. By Bud Fisher;' April 3, 1909, ' Mutt's book blows $40 and Jeff can't get over the shock. By Bud Fisher.'

" 19. Cartoons in the form of ' comic strips ' in which the word ' Mutt ' and the word ' Jeff ' both appeared in the title and which consist entirely of the cartoon characters ' Mutt ' and ' Jeff ' appeared on a number of dates in the San Francisco *Examiner* prior to May 12, 1909, on which date the last cartoon was published in the San Francisco *Examiner* before Harry C. Fisher came to New York and began drawing his ' comic strips ' in New York for publication in the New York *American*.

" 20. The said cartoons published by Harry C. Fisher in the San Francisco *Examiner* before he came to New York in May, 1909, had become and were at that time known to the public as ' Mutt and Jeff.'

" 21. The New York *American* is a daily newspaper published in the city of New York by the Star Company, the defendant in this action.

" 22. Harry C. Fisher came to New York between May 12, and May 18, 1909, and on May 18, 1909, there was published in the New York *American* a cartoon in the form of a comic strip drawn by Harry C. Fisher consisting chiefly of the character known as ' Mutt ' and containing the word ' Mutt ' as the name of said cartoon character.

" 23. From May 18, 1909, until January 29, 1915, cartoons in the form of comic strips drawn by Harry C. Fisher were published in the New York *American* almost daily.

" 24. The said ' comic strips ' drawn by Harry C. Fisher and published in the *American* between said dates sometimes depicted the character known as ' Mutt ' alone; sometimes depicted the character known as ' Jeff ' alone;

27

often depicted the characters ' Mutt ' and ' Jeff ' together, without any other characters appearing in the ' comic strips,' and sometimes depicted other characters in connection with the characters of ' Mutt ' and ' Jeff ' or both.

" 25. The comic strips drawn by Harry C. Fisher and published in the New York *American* beginning May 18, 1909, possessed the same general characteristics and appearance and consisted of the same general subject matter as did the cartoons drawn by Harry C. Fisher and published in the San Francisco *Chronicle* and *Examiner* prior to May 12, 1909.

" 26. On February 24, 1909, the Examiner Printing Company, publisher of the San Francisco *Examiner*, made a contract with Harry C. Fisher, whereby Harry C. Fisher agreed for the period of three years to furnish his said cartoons in the form of ' comic strips ' exclusively to the San Francisco *Examiner*.

" 27. Harry C. Fisher received the compensation named in the said contract and furnished his ' comic strips ' to the San Francisco *Examiner* pursuant thereto from the date thereof until on or about May 12, 1909, when he came to New York and began to furnish his ' comic strips ' to the New York *American* and to receive the compensation named in the contract of February 24, 1909, from the Star Company which continued until August 8, 1910.

" 28. On August 8, 1910, the Star Company and Harry C. Fisher made and entered into the agreement in writing which has been marked ' Plaintiff's Exhibit 1 ' and at that time the President of the Star Company undertook to have the contract between the Examiner Printing Company and Harry C. Fisher of February 24, 1909, cancelled and thereafter the said contract of February 24, 1909, was by mutual consent of the parties thereto considered to be abandoned.

" 29. On July 15, 1910, Harry C. Fisher made a

contract with Mr. Charles T. McCotter doing business under the name of the Ball Publishing Company for the publication in book form of certain of the cartoons previously drawn by Harry C. Fisher and published in the New York *American;* and the said contract was made by and with the consent of the Star Company.

" 30. On September 22, 1910, Harry C. Fisher published in book form about fifty of his cartoons called ' comic strips ' selected from those previously drawn by him and published in the New York *American;* and the said book of cartoons was published under the title of ' The Mutt and Jeff Cartoons.   By Bud Fisher.'

" 31. The said book of cartoons was copyrighted under the title ' The Mutt and Jeff Cartoons.   By Bud Fisher ' by Harry C. Fisher in his own name on September 22, 1910.

" 32. The said book of cartoons was published as aforesaid under the title ' Mutt and Jeff Cartoons.   By Bud Fisher,' with the knowledge and consent of the Star Company."

On November 1, 1911, a second, and on November 25, 1912, a third book of said cartoons was published by respondent under a similar title and each was similarly copyrighted by respondent with the knowledge and consent of the appellant.

" 35. Before Harry C. Fisher came to New York in May, 1909, his cartoons of the characters ' Mutt ' and ' Jeff ' were generally known to the public and the newspapers as the ' Mutt and Jeff ' cartoons and Harry C. Fisher was generally known as the author or artist of the ' Mutt and Jeff ' cartoons and when he came to New York in May, 1909, Harry C. Fisher was introduced by an employee of the Star Company to the managing editor of the New York *American* with the words ' I want to introduce you to Mutt and Jeff.'

" 36. The first cartoon on which the words ' Mutt and Jeff ' were published as a title to cartoons or ' comic

strips ' was on September 22, 1910, when the first book of ' Mutt and Jeff ' cartoons was published and copyrighted by Harry C. Fisher as aforesaid."

Prior to the trial of the action between 300,000 and 400,000 copies of said books were sold.

" 38. From May 18, 1909, to December 11, 1914, the cartoons drawn by Harry C. Fisher were published by the Star Company in its newspaper, the New York *American* under the titles or captions furnished with the cartoons by Harry C. Fisher.

" 39. The said titles or captions furnished by Harry C. Fisher with his cartoons or ' comic strips ' and published from day to day in the New York *American* between May 18, 1909, and December 11, 1914, changed from day to day and consisted of a sentence in which sometimes neither the word ' Mutt ' nor the word ' Jeff ' would appear but in which usually the word ' Mutt ' or the word ' Jeff ' appeared and in which frequently the word ' Mutt ' and the word ' Jeff ' both appeared. But on no occasion between May 18, 1909, and December 11, 1914, did the Star Company publish one of Harry C. Fisher's cartoons or ' comic strips ' under the title ' Mutt and Jeff.'

" 40. On December 7, 1914, Harry C. Fisher made a contract with The Wheeler Syndicate, Inc., whereby Harry C. Fisher agreed to furnish his cartoons or ' comic strips ' exclusively to The Wheeler Syndicate, Inc., as his agent for newspaper publication for a term of three years beginning on the expiration of Harry C. Fisher's contract with the Star Company that is to say on August 8, 1915.

" 42. On December 11, 1914, the Star Company without the knowledge or consent of Harry C. Fisher added to the title or caption of the cartoon furnished to the Star Company by Harry C. Fisher for publication in the New York *American* on that date the words ' Mutt and Jeff ' so that the title of the said cartoon which was

furnished to the New York *American* in the following words to wit: ' The Little Fellow Knows Some Law and Proves It. By Bud Fisher,' was changed to read as it was published in the New York *American* on that date: ' Mutt and Jeff. The Little Fellow Knows Some Law and Proves It. By Bud Fisher,' against this change in his title Harry C. Fisher immediately protested. The Star Company did not change the title of the said cartoon of December 11, 1914, when it furnished the said cartoon to newspapers for publication outside of the city of New York and the said cartoon of December 11, 1914, was published outside the city of New York under the title furnished with it by Harry C. Fisher.

" 43. After December 11, 1914, the Star Company published the cartoons drawn by Harry C. Fisher under the titles furnished by Harry C. Fisher, no one of which contained the words ' Mutt and Jeff ' continuously until January 19, 1915, on which date the Star Company without the knowledge or consent of Harry C. Fisher, removed the title furnished by Harry C. Fisher with his cartoon to be published on that date and substituted in place thereof the words ' Mutt and Jeff.' After January 19, 1915, and to and including January 29, 1915, the Star Company without the consent of Harry C. Fisher and over his protest removed the titles furnished by Harry C. Fisher with his cartoons and placed on each of them published between the said dates the title ' Mutt and Jeff. By Bud Fisher,' after which Harry C. Fisher refused to furnish any further cartoons to the Star Company and none was published by it after January 29, 1915.

" 44. Beginning with November 15, 1907, and continuing to the present time Harry C. Fisher has exclusively drawn the cartoon character which he has named ' Mutt ' and which has become generally known to newspaper publishers and to the public as the cartoon character ' Mutt ' and is generally recognized as such by the public.

" 45. Beginning with March 17, 1908, and continuing to the present time Harry C. Fisher has exclusively drawn the cartoon character which he has named ' Jeff ' and which has become generally known to newspaper publishers and to the public as the cartoon character ' Jeff ' and is generally recognized as such by the public.

" 46. Harry C. Fisher drew and published cartoons in the form of ' comic strips ' containing both the character ' Mutt ' and the character ' Jeff ' and in the title thereof both the name ' Mutt ' and the name ' Jeff ' before any of his cartoons were published in the New York *American,* and before he made any contract to furnish cartoons to the Star Company.

" 47. Neither the Star Company nor any of its officers, agents or employees ever published any cartoon characters similar to the cartoon character drawn by Harry C. Fisher and named by him ' Mutt ' or the cartoon character drawn by Harry C. Fisher and named by him ' Jeff ' or used the name ' Mutt ' or the name ' Jeff ' as a title to a cartoon or to a cartoon character before Mr. Fisher came to New York in May, 1909, and began furnishing cartoons to the New York *American.*

" 48. Harry C. Fisher did no work and furnished no material to the Star Company other than to draw cartoons in the form of ' comic strip ' consisting chiefly of the cartoon character ' Mutt ' and the cartoon character ' Jeff.' Harry C. Fisher was not a general employee of the Star Company. After August 8, 1915, Harry C. Fisher was under no obligation to furnish any cartoons to the Star Company.

" 49. Harry C. Fisher is now engaged through The Wheeler Syndicate, Inc., as his selling agent in selling to newspapers throughout the United States and Canada the right to publish his said cartoons consisting of the cartoon characters ' Mutt ' and ' Jeff ' in the form of ' comic strips ' and the same are being published from day to day in such newspapers.

" 50. The said cartoons so being furnished by Harry C. Fisher to newspapers throughout the United States and Canada and being published as aforesaid consist of representations of the said cartoon characters ' Mutt ' and ' Jeff ' and are generally of the same kind and character as those previously drawn by Harry C. Fisher and are generally known to such newspapers and to the public at large as the ' Mutt ' and ' Jeff ' cartoons and the same are now being published under the name of the ' Mutt ' and ' Jeff ' cartoons.

" 51. The defendant Star Company among other things is also engaged in a similar business of furnishing cartoons to newspapers throughout the United States and Canada for daily publication.

" 52. Since Harry C. Fisher ceased furnishing his said cartoons to the defendant Star Company, it has caused certain of its employees to draw cartoons in the form of ' comic strips ' consisting of cartoon characters drawn in imitation of the said cartoon character known as ' Mutt ' and in imitation of the said cartoon character known as ' Jeff ' which are so like the said cartoons in the form of ' comic strips ' drawn by Harry C. Fisher as to be likely to deceive the public into thinking that the said cartoons are in fact Harry C. Fisher's genuine ' Mutt and Jeff ' cartoons.

" 53. The Star Company has advertised the said cartoons so drawn by its employees in imitation of the said cartoons of Harry C. Fisher as ' the original Mutt and Jeff ' cartoons and was about to publish the same in the New York *American* and to sell the same to other newspapers for publication throughout the United States when restrained from so doing by the temporary injunction of this court; and the Star Company intends to sell and publish such imitation cartoons in the future unless restrained by this court."

Upon the findings and accompanying conclusions of law, judgment was entered against the defendant, its

agents, and employees, and it and they were perpetually enjoined:

" 1. From using the words ' Mutt and Jeff ' or the word ' Mutt ' or the word ' Jeff ' as a name or trademark for or in connection with cartoons.

" 2. From publishing and from advertising and offering for sale and from selling any cartoons not drawn by Harry C. Fisher which are, however, drawn in imitation of Harry C. Fisher's cartoons of the cartoon characters ' Mutt ' and ' Jeff ' and so like the ' Mutt and Jeff ' cartoons drawn by Harry C. Fisher as to be likely to deceive the public into believing that the said imitation cartoons are Harry C. Fisher's genuine ' Mutt and Jeff ' cartoons.

" 3. That nothing in this judgment shall be construed as enjoining the Star Company from republishing any of the cartoons and the title and text accompanying each, respectively, which have been heretofore drawn by Harry C. Fisher and published by the Star Company in the New York *American* or as restraining the Star Company from exercising any rights which it may possess by reason of its ownership of the copyright of certain of the ' Mutt and Jeff ' cartoons drawn by Harry C. Fisher which have been heretofore published."

*Nathan Burkan* and *William A. De Ford* for appellant. The publication, without copyright, of the plaintiff's cartoons made the whole and every part of such cartoons, including the figures " Mutt " and " Jeff," public property. (*Tompkins* v. *Halleck*, 133 Mass. 32; *Mark Twain Case*, 14 Fed. Rep. 728; *Iolanthe Case*, 15 Fed. Rep. 442; *J. M. Agency* v. *J. P. Co.*, 155 N. Y. 247; *Glaser* v. *St. Elm Co.*, 175 Fed. Rep. 276; *Atlas Mfg. Co.* v. *Street & Smith*, 204 Fed. Rep. 403; *Caliga* v. *Inter-Ocean Newspaper Co.*, 157 Fed. Rep. 186; *Oertel* v. *Jacoby*, 44 How. Pr. 179; *Snow* v. *Laird*, 98 Fed. Rep. 813; *Bamforth* v. *Douglas Post Card & Machine Co.*, 158 Fed. Rep. 355.) The dedication of the Mutt and Jeff cartoons and of the

figures " Mutt " and " Jeff " necessarily gave to the public the right to designate any reproductions of those cartoons and those figures by the names by which they were designated when published and dedicated. (*Tabor* v. *Hoffman,* 118 N. Y. 34; *Merriam Co.* v. *Ogilvie,* 159 Fed. Rep. 638; *Merriam Co.* v. *Syndicate Publishing Co.,* 237 U. S. 623; *Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 186; *Merriam* v. *Holloway Pub. Co.,* 43 Fed. Rep. 450; *Merriam* v. *Famous S. & C. Co.,* 47 Fed. Rep. 411; *Saxlehner* v. *Wagner,* 216 U. S. 375; *Merriam* v. *Syndicate Pub. Co.,* 207 Fed. Rep. 515.) After the names " Mutt " and " Jeff " had become public property, they could not be thereafter made the subject of exclusive ownership. (*Black* v. *Ehrich,* 44 Fed. Rep. 793; *Atlas Mfg. Co.* v. *Street & Smith,* 204 Fed. Rep. 402; *Pennock* v. *Dialogue,* 2 Pet. 16; *Ogilvie* v. *Merriam Co.,* 149 Fed. Rep. 858; *Merriam* v. *Syndicate Pub. Co.,* 237 U. S. 618; *Caliga* v. *Inter-Ocean Newspaper Co.,* 215 U. S. 182; 157 Fed. Rep. 186.) The plaintiff's sole connection with the Mutt and Jeff cartoons was that of an author. He never published any newspapers or comic strips. He never used the names " Mutt " and " Jeff " in connection with the publication or sale by him of cartoons or comic strips. Hence he acquired no good will represented by such names. (*Caswell* v. *Hazard,* 121 N. Y. 494; *Jaeger's Co.* v. *Le Boulillier,* 47 How. 521; *Hanover Milling Co.* v. *Metcalf,* 240 U. S. 403; *United Drug Co.* v. *Rectanus Co.,* 248 U. S. 90; *N. Y. Herald Co.* v. *Star Co.,* 146 Fed. Rep. 204; 146 Fed. Rep. 1023; *Outcalt* v. *New York Herald,* 146 Fed. Rep. 205.) The judgment should be reversed because of its uncertainty and because it cannot be enforced without denying the defendant's rights under the United States copyright laws, which is beyond the court's jurisdiction. (*Ferris* v. *Frohman,* 223 U. S. 431; *Fishel* v. *Lueckel,* 53 Fed. Rep. 499; *Swift & Co.* v. *United States,* 196 U. S. 375; *Lyon* v. *Botchford,* 25 Hun, 57; *Matter of Huntley,* 85 Fed. Rep. 889.)

*Charles E. Kelley* for respondent. The judgment appealed from rests upon the principles of the law of unfair competition. (*McLean* v. *Fleming*, 96 U. S. 245; *Associated Press* v. *I. N. Service*, 248 U. S. 215; *Nat. Biscuit Co.* v. *Baker*, 95 Fed. Rep. 135; *Singleton* v. *Bolton*, 3 Dougl. 293; *Hogg* v. *Kirby*, 8 Ves. Jr. 215; *Sykes* v. *Sykes*, 3 B. & C. 541; *Day* v. *Binning*, C. P. Cooper, 489; *Croft* v. *Day*, 7 Beav. 84; *Blofeld* v. *Payne*, 4 B. & Ad. 410; *Millington* v. *Fox*, 3 M. & C. 338.) The cartoon characters were not dedicated to the public. (*Associated Press* v. *I. N. Service*, 248 U. S. 215; *Le Gendre* v. *Scottish Ins. Co.*, 183 N. Y. 392.) The judgment appealed from does not interfere with the appellant's rights under the United States Copyright Law. (*Outcault* v. *Lamar*, 135 App. Div. 110.)

CHASE, J. This action is brought to enjoin the appellant from what the respondent asserts is unfair competition in making and publishing cartoons. The question on this appeal is whether the courts should use the equitable jurisdiction given to them to restrain a person or corporation from using in a cartoon, or in cartoons prepared for publication and sale as a business, certain grotesque figures, being imaginary and fictitious characters and the names applied to them, when such figures and names were originated and have been applied and used by a person in connection with his work as a cartoonist until they have become well known and have as such figures or characters with their names, a definite place among cartoonists and the admirers of cartoons, and with the public at large, and as such are of substantial value. The plaintiff does not assert his right to injunctive relief by virtue of the copyright law, the enforcement of which is confined to the Federal courts. (U. S. Compiled Statutes 1918, secs. 9555, 9556.) He does not assert his claim by virtue of the Federal Trade Mark Law (Act of February 20, 1905) or the statutes relating to trade

marks in this state (See Laws of 1909, chapters 9, 25, 36 and 88; Penal Law, secs. 2350 to 2357) or in other states.

The statute creating the Federal Trade Commission (Act of September 26, 1914) and giving it authority to prevent unfair methods of competition does not apply to unfair methods between individuals. The unfair methods contemplated by the act are such as affect the public generally. (*Federal Trade Commission* v. *Gratz,* 258 Fed. Rep. 314.) To sustain his claim the respondent relies entirely upon the authority of the courts in equity to prevent what is known as unfair competition.

A person who uses an unregistered name or mark can prevent others using the same so as to deceive the public into thinking that the business carried on by such persons and the goods sold by them are his. (27 Halsbury's Laws of England, 744.) Such conduct as is calculated to deceive the public into believing that the business of the wrongdoer is the business of him whose name, sign or mark is simulated or appropriated can be restrained in equity. (*Ball* v. *Broadway Bazaar,* 194 N. Y. 429; *Westcott Chuck Co.* v. *Oneida National Chuck Co.,* 199 N. Y. 247; *Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 169; *Fox Co.* v. *Glynn,* 191 Mass. 344.)

The courts are not confined in the exercise of their equitable powers to preventing unfair competition among the manufacturers of and dealers in goods. The controlling question in all cases where the equitable power of the courts is invoked is, whether the acts complained of are fair or unfair. The determination of this appeal depends first and primarily upon the facts. (*Higgins Co.* v. *Higgins Soap Co.,* 144 N. Y. 462; *Howe Scale Co.* v. *Wyckoff, Seamans, etc.,* 198 U. S. 118; *Kroppf* v. *Furst,* 94 Fed. Rep. 150.) The inquiry is, whether the use of the names " Mutt " and " Jeff " and the grotesque figures to which the names are applied by the appellant would be unfair to the respondent. A statement of the

facts found at the Special Term has been given preceding this opinion, at unusual length, because it will obviate the necessity of stating many of them in the opinion, and also because the true basis of the decision herein cannot be fully understood without a complete knowedge of the facts on which it depends. (*Baker & Co.* v. *Sanders*, 80 Fed. Rep. 889, 891.) The facts as found were unanimously affirmed at the Appellate Division (*Fisher* v. *Star Company*, 188 App. Div. 964), and are conclusive upon this court. (Constitution, art. 6, section 9· *Porter* v. *Municipal Gas Co.*, 220 N. Y. 152.)

The rules stated as to competition in business apply to the publication of books under a particular name. Such a name is the subject of property and a colorable imitation of the name adopted by one publisher, by another engaged in publishing similar books by which the public may be easily misled into supposing that it was the literary article they desired to obtain, is an act of deception which injures the publisher who first adopted the name and which he may call upon a court of equity to redress. (*Munro* v. *Tousey*, 129 N. Y. 38.)

Trade marks may consist of pictures, symbols of a peculiar form, or fashion of label, or they may consist simply of a word or words. (*Hier* v. *Abrahams*, 82 N. Y. 519.) Any civil right not unlawful in itself nor against public policy, that has acquired a pecuniary value, becomes a property right that is entitled to protection as such. The courts have frequently exercised this right. They have never refused to do so when the facts show that the failure to exercise equitable jurisdiction would permit unfair competition in trade or in any matter pertaining to a property right.

In *International News Service* v. *The Associated Press* (248 U. S. 215) the Associated Press sought to enjoin the International News Company from appropriating for commercial use matter taken from bulletins or early editions of Associated Press publications as constituting unfair

competition in trade. It was not claimed that the news articles were protected by copyright. The court say: " We need spend no time, however, upon the general question of property in news matter at common law, or the application of the copyright act, since it seems to us the case must turn upon the question of unfair competition in business. * * * In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right; and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard property already acquired. It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition." (pp. 234, 236.) The appropriation of the news gathered by the Associated Press was enjoined.

Justice HOLMES in a concurring opinion says: " Property depends upon exclusion by law from interference, and a person is not excluded from using any combination of words merely because some one has used it before, even if it took labor and genius to make it. If a given person is to be prohibited from making the use of words that his neighbors are free to make, some other ground must be found. One such ground is vaguely expressed in the phrase 'unfair trade.' This means that the words are repeated by a competitor in business in such a way as to convey a misrepresentation that materially injures the person who first used them, by appropriating credit of some kind which the first user has earned. The ordinary case is a representation by device, appearance, or other indirection that the defendant's goods come from the plaintiff. But the only reason why it is actionable to make such representation is that it tends to give the defendant an advantage in his competition with the

plaintiff and that it is thought undesirable that an advantage should be gained in that way. Apart from that the defendant may use such unpatented devices and uncopyrighted combinations of words as he likes. The ordinary case, I say, is palming off the defendant's product as the plaintiff's, but the same evil may follow from the opposite falsehood,— from saying, whether in words, or by implication, that the plaintiff's product is the defendant's, and that, it seems to me, is what has happened here." (p. 246.)

In *Bell* v. *Locke* (8 Paige, 75) the plaintiff sought to restrain the defendant from assuming the name of the plaintiff's newspaper for the fraudulent purpose of imposing upon the public and supplanting him in the good will of his paper. It was held that by simulating the name and dress of his newspaper with the intent to cause it to be understood and believed by the community that the defendant's newspaper was the same as the complainant's and thereby to injure the circulation of the latter, the plaintiff would be entitled to an injunction for although the business of publishing newspapers ought, in a free country, to be always open to the most unlimited competition, fraud and deception certainly are not essential to the most perfect freedom of the press. There is indeed no patent right in the names. There can be very little excuse for the editor of a newspaper who shall adopt the precise name and address of an old established paper which would be likely to interfere with the good will of the latter by actually deceiving its patrons.

In *Estes* v. *Williams* (21 Fed. Rep. 189) it appears that a person in London, England, published a series of juvenile books of uniform appearance and in a style of peculiar attractiveness and called them " Chatterbox " until they became widely known and quite popular by that name in that country and this. He assigned the exclusive right to use and protect that name in this country to the plaintiff. The defendants commenced the

publication of a series of books and called them by that name and made them so similar in appearance and style as to lead purchasers to think that they are the same. Held, that the plaintiff was entitled to equitable relief.

The principle which interdicts unfair competition in trade will protect a publisher who has imparted to his books peculiar characteristics which enable the public to distinguish them from books published by others and containing the same literary matter against the copying of the characteristics though the copyright on the literary matter has expired. (*Merriam Co.* v. *Straus,* 136 Fed. Rep. 477; *Merriam Co.* v. *Saalfield Pub. Co.,* 238 Fed. Rep. 1.)

Even in the case of a patented article like the Singer sewing machine where on the expiration of the patent the right to use the name of the patentee passes to the public, it is unlawful to so design a machine and place the name thereon as to deceive the public into believing that the machine made by a new company was actually made by the old Singer Manufacturing Company. (*Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 169.)

In *McLean* v. *Fleming* (96 U. S. 245, 251) it was held that no trader can adopt a trade mark so resembling that of another trader as that ordinary purchasers buying with ordinary caution are likely to be misled. The court in discussing the question say: " Equity gives relief in such a case, upon the ground that one man is not allowed to offer his goods for sale, representing them to be the manufacture of another trader in the same commodity. Suppose the latter has obtained celebrity in his manufacture, he is entitled to *all the advantages of that celebrity,* whether resulting from the greater demand for his goods or from the higher price the public are willing to give for the article, rather than for the goods of the other manufacturer, whose reputation is not so high as a manufacturer."

It appears from the findings of fact that the grotesque

figures in respondent's cartoons, as well as the names
" Mutt " and " Jeff " applied to them have in consequence
of the way in which they have been exploited by the
respondent and the appearance and assumed characters
of the imaginary figures have been maintained, acquired
a meaning apart from their primary meaning, which is
known as a secondary meaning. The secondary meaning
that is applicable to the figures and the names is that
respondent originated them and that his genius pervades
all that they appear to do or say.

It also appears from the findings of fact that the
respondent is the owner of the property right existing
in the characters represented in such figures and names.
They are of his creation. They were published and
became well known as distinct characters before the
contract was made with the appellant. Property rights
in literary and other property, the product of the brain
as between employer and employee, are determined by
what was contemplated by the contract of employment.
(*Root* v. *Borst*, 142 N. Y. 62.)

While the contract with appellant contemplated that
the respondent should draw cartoons in the form of
comic strips in which he would use the figures known as
" Mutt " and " Jeff " and the names connected therewith
as he had done prior to such contract, it did not purport
to sell to appellant his property rights then existing
or which might be acquired thereafter. The contract
with appellant expired on August 8, 1915. The common-
law right of property that the plaintiff had in particular
cartoons was lost when they were severally published.
(*Caliga* v. *Inter Ocean Newspaper Co.*, 215 U. S. 182.)
The respondent does not claim to the contrary. If the
copyrights were to be considered, it would appear that the
respondent was the first to copyright one of his cartoons
containing the well-known figure of " Mutt " and in which
the name " Mutt " was applied to the figure. He also
copyrighted the book in which the cartoons were desig-

nated as " The Mutt and Jeff Cartoons.   By Bud Fisher."
(See decision December 22, 1916, by examiner of inter-
ferences denying an application of the Star Company to
cancel the registration by Fisher of the words " Mutt
and Jeff" as a trade mark, March 9, 1915.   Official
Gazette of the United States Patent Office, vol. 236, No.
1, page 283.)   The name " Bud Fisher " was used by the
respondent in connection with his work as a cartoonist.

As we have already stated, it is unnecessary to discuss
the question of the rights of the public or of appellant to
reproduce the particular cartoons that have been pub-
lished because the plaintiff's claim in this action rests
upon other facts and principles as stated herein.   The
figures and names have been so connected with the
respondent as their originator or author, that the use by
another of new cartoons exploiting the characters " Mutt
and Jeff" would be unfair to the public and to the
plaintiff.   No person should be permitted to pass off as
his own the thoughts and works of another.

If appellant's employees can so imitate the work of the
respondent that the admirers of " Mutt and Jeff " will
purchase the papers containing the imitations of the
respondent's work, it may result in the public tiring of
the " Mutt and Jeff " cartoons by reason of inferior
imitations or otherwise, and in any case in financial
damage to the respondent and an unfair appropriation
of his skill and the celebrity acquired by him in originating,
producing and maintaining the characters and figures so
as to continue the demand for further cartoons in which
they appear.

The only purpose that another than respondent can
have in using the figures or names of " Mutt " and
" Jeff " is to appropriate the financial value that such
figures and names have acquired by reason of the skill
of the respondent.

The appellant urges that the courts have decided

adversely to the claim of the respondent in a litigation which related to the use of the name " Buster Brown " as a title of a comic section of a newspaper.

A cartoonist had made pictures for a comic section of the New York *Herald* in which " Buster Brown " was the principal figure. A similar comic section was printed by a newspaper published by the appellant, and the New York Herald Company brought an action against the appellant, the decision in which is reported in 146 Federal Reporter, 204. From the opinion in that case it appears that the suit was solely to restrain an infringement of a trade mark and the court say: " *No question* as to copyright or *as to unfair competition is presented.*" It was found that the Herald Company was the first to use the name, title and trade mark of " Buster Brown " as a heading to a comic section of its newspaper and that it had shown title to the trade mark.

In the case of *Outcalt* v. *New York Herald* (146 Fed. Rep. 205) the court held that so far as the question of the use of the title " Buster Brown " was concerned it had been disposed of by the decision in the case of *New York Herald Company* v. *Star Company*. The facts in the instant case differentiate it from the *Outcalt* case in every other respect.

In an action brought by the New York Herald Company against Ottawa Citizens Company of Canada, it was held (41 Canada Supreme Court, 229) that the term " Buster Brown " or " Buster Brown and Tige " used as the title to a comic section of a newspaper cannot be registered as a trade mark. In the opinion written for a majority of the court it is said: ".The production which the appellant sells is not a kind of paper or of paper colored in any particular way or covered with a peculiar kind of ink or set form or figures. It is the nonsense that is produced by the brain of the man writing for the diversion of the idle that in truth is sold. It may be that kind of brain product that the copyright might

amongst other things be extended to or that copyright might cover * * *. I am quite sure it never was intended those sections should apply to such a thing."

The *New York Herald* cases mentioned do not materially affect the question in this case.

The judgment should be affirmed, with costs.

Opinion prepared by CHASE, J., who died before decision of the case.

All concur except CRANE, J., who dissents on the ground that plaintiff seeks to maintain rights which can only be had under the copyright law. The copyright law does not apply and the plaintiff has no rights thereunder. This action in my judgment is in effect a substitute for the rights which the plaintiff might have had under the copyright law.

Judgment affirmed.