OPINION OF THE COURT
Martin B. Stecher, J.
In what is purported to be a first prosecution of its kind in New York State, Paul Winley was convicted on all counts of a 22-count indictment. Eleven counts charged that the defendant “cause[d]” the manufacture of “unauthorized recording of sound” (Penal Law, § 275.05), and 11 counts charged the “advertisement and sale of unauthorized recording of sound” (Penal Law, § 275.10). The attorney for the defendant has moved to set aside the various verdicts for the reasons hereafter discussed.
The evidence showed that on or about March 5, 1979, Detective James Rodriquez of the New York City Police Department approached the defendant and sought to pur *475 chase from him quantities of various records which, allegedly, had been previously distributed on the defendant’s own labels. Posing as a middleman and acting largely on information supplied by the Recording Industry Association of America (RIAA), Detective Rodriquez negotiated a purchase of several thousand copies of each of two records. Of the 20 or more songs contained in the aggregate on the two records, 11 were subjects of this indictment. Three were claimed to be “owned” by CBS Records, Inc., six by Nashboro Recording Company, and two by Savoy Records, Inc. The Savoy claims involved recordings made by the Reverend James Cleveland. The remaining nine songs were recordings made by Mahalia Jackson. Eleven recordings are what is known in the trade as “Black Gospel” music.
Rodriquez and Winley negotiated a price of $1.50 each for 4,000 records, or $6,000. Winley insisted upon and received from Rodriquez, in New York County, a down payment of $2,000 which Winley said was demanded by the company which would press the records as a condition to manufacture.
From the evidence it appears that the two Winley records containing the 11 allegedly illicit recordings were pressed in Rahway, New Jersey, picked up there by the defendant in his station wagon, and returned by the defendant to his office in Manhattan. On the same day that the records were obtained by Winley from New Jersey, Rodriquez appeared at the defendant’s place of business to “conclude” the transaction. Winley caused all the records to be loaded into Rodriquez’ truck, whereupon Rodriquez instead of paying Winley the remaining $4,000, arrested him and charged him with these offenses.
The first issue with which we are confronted is whether any of the manufacturing was committed in the State of New York, within the meaning of the statute (GPL art 20). The manufacture of unauthorized recordings of sound was complete when the records were pressed and in condition to be played. Certainly, the crime of manufacturing was complete no later than the time when the completed records were inserted in albums ready for delivery to the defendant’s customer. From the evidence before the jury, *476 both of these acts, that is, pressing and packaging, occurred in New Jersey. “Manufacture”, under these facts, cannot be prosecuted in the State of New York unless “[c]onduet occurred within this state sufficient to establish * * * [a]n element of such offense”. (CPL 20.20, subd 1, par [a].) Even if an element of the crime was committed in the State of New York, as the crime appears to have been “consummated” in New Jersey, the acts committed in New York do not constitute an indictable offense in New York “unless the conduct constituting the consummated offense * * * constitutes an offense under the laws of [New Jersey] as well as under the laws of this state” (CPL 20.30) New Jersey’s statute (NJSA, § 2A:lll-52 et seq.) corresponds in all material elements to the New York statute (Penal Law, § 275.00 et seq.) and the place of consummation of the crime is not an impediment to the prosecution. The question which remains is: was any portion of the crime of manufacturing records or causing such records to be manufactured committed in the State of New York? In my judgment, the evidence satisfied this requirement.
The People clearly established that the proprietor of the factory at which the records were pressed would not have manufactured them without an advance payment. Winley, in turn insisted upon and received from Rodriquez, in New York County, all or part of the sums necessary to induce the New Jersey company to press the records. The jury could have properly concluded beyond a reasonable doubt, that but for this solicitation and receipt of funds, the records would not have been pressed.
What constitutes a “cause” of an illegal act is not defined in our Penal Law and we are cautioned to avoid definition by analogy to tort proceedings (People v Kibbe, 35 NY2d 407, 412, citing People v Rosenheimer, 209 NY 115, 123). “Cause” of a crime has been variously defined. The American Law Institute, in its Model Penal Code (proposed official draft [1962] § 2.03, subd [1], par [a]) defined conduct as, “the cause of a result when: (a) it is an antecedent but for which the result in question would not have occurred”. Similar “but for which” tests have been adopted in several States (cf. Ark Stat Ann, § 41-205; 11 Del Code *477 Ann, tit 11, § 261; Me Rev Stat Ann, tit 17-A, §§ 5, 6). Corpus Juris Secundum (14 CJS, Cause, pp 41-42) defines “cause”: “Philosophically speaking, the sum of all the antecedents of any event constitutes its cause; but ordinarily each separate antecedent of an event is considered as a cause for such event, provided, however, that the event could not have happened except for such antecedent; and so the word has been defined specifically as a state of facts from which a certain condition, commonly called a result or effect, arises, that condition which determines the final result or whose share in the matter is the more conspicuous and is the more immediately preceding and proximate to the event; that on which a thing under given circumstances follows, or that which produces or effects a result, or from which anything proceeds, and without which it would not exist.”
The United States Supreme Court (Pereira v United States, 347 US 1, 8-9) and the New York Court of Appeals (People v Kibbe, 35 NY2d 407, supra) have dealt with the sufficiency of a cause where other elements were involved in accomplishment of the final, criminal result. In Kibbe (sub nom. Henderson v Kibbe, 431 US .145, 155-156, supra) the United States Supreme Court said, “an adequate instruction would have told the jury that if the ultimate harm should have been foreseen as being reasonably related to defendants’ conduct, that conduct should be regarded as having caused the death”.
By any test, Winley caused the records to be manufactured in New Jersey; and it is clear that his order would not have resulted in their manufacture in the absence of the prepayment to the record manufacturer. By securing the funds in New York from Detective Rodriquez for delivery to New Jersey, Winley engaged in conduct in “this state sufficient to establish * * * [a]n element of [the] offense” (CPL 20.-20, subd 1, par [a])[1]
*478 Accordingly, the motion to set aside the verdict as to the manufacturing counts by reason of lack of jurisdiction is denied.
The motion to dismiss by reason of alleged entrapment of the defendant need occupy little of our time. Unquestionably, the defendant was encouraged to commit the crime by a public servant seeking to obtain evidence against him for the purposes of criminal prosecution, but the jury had more than enough evidence to conclude that the defendant failed to sustain his burden (Penal Law, § 25.00, subd 2) of proving that the detective’s conduct created “a substantial risk that the offense would be committed by a person not otherwise disposed to commit it” (Penal Law, § 40.05). Winley’s past history of pressing and selling these very recordings would rule out entrapment.
A difficult issue with respect to some of the counts of the indictment was the statutory requirement that the People prove that the defendant caused the records to be manufactured for profit or sold them “without the consent of the owner” (Penal Law, § 275.05, subd 1; § 275.10, subd 1). The statutory definition of owner (Penal Law, § 275.00, subd 2) is of little help. It defines “owner” as “the person who owns the original fixation of sounds embodied in the master phonograph record, master disc, master tape, master film or other device used for reproducing sounds on phonograph records, discs, tapes, films, or other articles upon which sound is recorded, and from which the transferred recorded sounds are directly derived.”
The predecessor statute (General Business Law, § 561, subd 2) defined “owner” as “the person who owns the master phonograph record, master disc, master tape, master film or other device used for reproducing recorded sounds * * * and from which the transferred recorded sounds are directly or indirectly derived.” Clearly, the later statute under which this prosecution was had, recognized that the ownership of a performance was not necessarily vested in *479 the person who had title to the mechanical means of reproducing the sounds of that performance.
A performance is a property right (Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp., 279 App Div 632).[2]
Ordinarily, it may be presumed that an artist who creates a performance is the owner of that performance. Usually, however, as appears to have been the case in many of the songs with which we are dealing, those rights are determined by contract between the artist and the recording company. The proof of title to “the original fixation of sounds embodied in the master phonograph record” (Penal Law, § 275.00, subd 2) was amply satisfied by proof in the case of the Savoy claims to Reverend Cleveland’s recordings of “Amazing Grace” and “Peace Be Still.” The Savoy witness, Mendelsohn, was present when Cleveland recorded these songs; he was able to identify Cleveland’s signature on the documents granting Savoy the exclusive right in perpetuity to reproduce those recordings; and, in many of the written instruments Mendelsohn was either an attesting witness or signatory on the behalf of Savoy. The inference to be drawn from the verdict that the jury found that Savoy was the owner of these performances is beyond challenge.
As to the six songs claimed to be owned by Nashboro Record Co., no such clear ownership is shown. Nashboro purportedly obtained its rights in 1968 by written agreement with Guardian Industries, Inc., or its proprietor, the *480 late Herbert Forgasch. It cannot be said that it was established beyond a reasonable doubt on this trial that Nashboro owned “the original fixation of sounds embodied in the master phonograph record” of each of the specified Mahalia Jackson recordings. The documents under which Nashboro claimed title appear- merely to be agreements permitting Nashboro to purchase records in each year and distribute them throughout the United States.
There was nothing in these documents to suggest that Guardian Industries intended to convey to Nashboro anything but the right to buy records and resell them. Even were we to interpret this document as Shannon Williams, the Nashboro representative, would have us interpret it, that is, that Nashboro was granted by Forgasch the exclusive right to reproduce those performances, it was not established beyond a reasonable doubt that Nashboro’s grantor had the right to grant such an exclusive license. The documents submitted in support of the People’s case were a contract between Bess Music Co., as assignor of Mahalia Jackson recordings and Edgewood Corporation as assignee. Bess Music, in turn, claimed in the documents to be the assignee of Apollo Records. No proof was offered of Apollo’s assignment, much less Apollo’s original right to reproduce the particular Mahalia Jackson recordings.[3] Under these circumstances, the jury was not justified in concluding beyond a reasonable doubt that these six songs were manufactured (Penal Law, § 275.05) or held for resale (Penal Law, § 275.10, subd 1) “without the consent of the owner”, for the owner was never adequately identified. Accordingly, the verdicts of guilty under the 7th through 18th counts of the indictment, inclusive, are set aside and those counts are dismissed.
The first through sixth counts involved CBS Record Co.’s claim to three other Mahalia Jackson performances, “Move *481 on Up a Little Higher,” “Just Over the Hill” and “I Have Done My Work”. A witness appearing on behalf of CBS Records produced a file which he said was made and kept in the ordinary course of business and which purported to be CBS’s file of contracts between itself and the late Miss Jackson. An effort was made to introduce these documents in evidence under the so-called business records rule (CPLR 4518). In my view, a contract with a third party and particularly the authenticity of the signature of that party may not be proved by the testimony of a witness who says these contracts were made and kept in the ordinary course of business. The function of the business record rule is to permit in evidence entries made by or on behalf of the witness or the witness’ employee under circumstances which certify and which demonstrate they were made under circumstances and at a time when there was no motive to falsify. Such proof, however, while it may establish the authenticity of the signature of the CBS official, will not serve to authenticate the signature of Mahalia Jackson, the person with whom CBS was contracting. There was proof offered, however, of circumstances from which the jury could conclude, beyond a reasonable doubt, that the signature of Mahalia Jackson was authentic. Such proof included the manner in which the documents were kept, the fact that recordings were made pursuant to the terms of such contracts, and that royalties were paid and accepted in accordance with the terms of such contracts and that from 1954 until her death Miss Jackson only recorded for CBS. All are evidence of circumstances from which the conclusion of authenticity may be drawn (cf. People v Dunbar Contr. Co., 215 NY 416, 423).
The motion to strike these exhibits is denied. These exhibits were sufficient to establish CBS’s “ownership” of the records beyond a reasonable doubt and the evidence of the defendant’s misappropriation of these recordings was sufficient to sustain a verdict of guilty on the first six counts of the indictment.
In accordance with the foregoing the motion to set aside the verdict and dismiss the indictment is granted as to *482 counts 7 through 18 and denied as to counts one through six and 19 through 22. Any motion on which decision was reserved and not otherwise disposed of is denied.

. It was the People’s contention during the trial that evidence of jurisdiction had only to be proved by a preponderance of the evidence (People v Tullo, 34 NY2d 712; People v Hetenyi, 304 NY 80). These cases support the view that in order to prove “county jurisdiction,” really venue, a mere preponderance of evidence supporting that proposition must be shown. Where so-called “State *478 jurisdiction” is involved, the issue is much more fundamental: was a crime committed against the People of the State of New York? This issue should require proof beyond a reasonable doubt and the jury was so instructed. (Cf. Matter of Steingut v Gold, 42 NY2d 811, 316.)

. From the evidence it appears that all of the performances misappropriated by Winley were recorded before 1971 at which time ownership was determined by common law and not by any copyright statute (see Goldstein v California, 412 US 546; International News Serv. v Associated Press, 248 US 215, 234, 236; Fisher v Star Co., 231 NY 414, 429). In 1971 (Public Law 92-140; 85 US Stat 391) the recorded art of the performer, as distinguished from the art of the composer or arranger, became the subject of Federal musical copyright, provided that the recording was “fixed, published and copyrighted on and after” February 15, 1972 (85 US Stat 392) The copyright statute has since been amended and recodified (US Code, tit 17) by section 101 of title 1 of Public Law 94-553 on October 19, 1976 (90 US Stat 2541) effective (for the most part) January 1, 1978. It thus appears that in dealing with “ownership” we are dealing with pre-1971 concepts in which State law continues in force and no Federal pre-emption occurs until February 15, 2047 (US Code, tit 17, § 301, subd [c] ).

. It is not intended here that only proof of an absolute title will support proof of ownership sufficient for the statutes (Penal Law, § 275.05, subd 1; § 275.10, subd 1). It is conceivable, although the question is not reached, that exclusive reproduction rights might be sufficient. But whatever those rights are they must be proved beyond a reasonable doubt. Obviously, we do not deal here with Nashboro’s rights in these recordings, we only deal with the proof presented at the trial.