UNIVERSAL FILM MFG. CO. v. COPPERMAN et al.

(Circuit Court of Appeals, Second Circuit. November 10, 1914.)

No. 77.

1. LITERARY PROPERTY (§§ 3, 5*)—SCENARIO—PHOTOPLAY.

Where complainants' assignor, a Danish corporation, composed a written scenario of a play, and then composed a photoplay by actual performance of the scenario recorded by a moving picture camera, from which it took positive films and sold one or more of them in England, where neither the scenario nor the photoplay was copyrighted, it had a common-law right of property in England in the intellectual conception of the play expressed in words, and in the intellectual conception of the photoplay expressed in actions, and could perform the written play itself, and license others to perform it, without prejudice to its common-law ownership, and so could perform or license others to perform the photoplay in the same way.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. §§ 2, 4; Dec. Dig. §§ 3, 5.*]

2. **LITERARY PROPERTY (§ 6*)—MOVING PICTURES—SALE OF FILM—CONDITIONS.**
Where the owner of a scenario and photoplay, neither of which was copyrighted in England, sold a positive film there, the purchaser and his assigns acquired the performing right, and though no one, by virtue of the sale, would acquire the right to re-enact the play and take a negative of it, or make a new negative from the positive film, the seller could not restrict the purchaser's right by a condition that the film should not be resold or hired for use, except in the country in which it was bought, nor sold for exportation.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 5; Dec. Dig. § 6.*]

3. **COPYRIGHTS (§ 41*)—FOREIGN SCENARIO IN PHOTOPLAY.**
Where the foreign owner of a scenario and photoplay took out a United States copyright on the latter separately, as it was authorized to do, it abandoned its common-law property rights therein.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 40, 48; Dec. Dig. § 41.*]

4. **LITERARY PROPERTY (§ 6*)—PHOTOPLAY—SALE OF FILMS.**
Where the foreign owner of a photoplay sold a positive film in England, where it was not copyrighted, subject to a void condition against resale for export, and later copyrighted the photoplay in the United States, it could not by such copyright avoid rights previously conferred by the sale of the films in England, and hence could not treat the purchaser's assignees in the United States as infringers.

[Ed. Note.—For other cases, see Literary Property, Cent. Dig. § 5; Dec. Dig. § 6.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Universal Film Manufacturing Company against S. Copperman, doing business as the Thalia Music Hall, and another. Judgment for defendants (212 Fed. 301), and complainant appeals. Affirmed.

W. G. Morse and J. L. Lotsch, both of New York City, for appellant.

S. F. Frank, of New York City, for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. The Nordisk Film Company, a corporation of Denmark, composed an original written scenario of a play called the "Great Circus Catastrophe," and then composed a photoplay by means of an actual performance of the scenario, recorded by a moving picture camera on a negative photographic film, from which it afterwards took positive films in the customary manner, to be used in performing the play by throwing the pictures upon a screen by means of a moving picture machine. The company copyrighted neither the scenario nor the photoplay in England, as it might have done, but advertised and sold throughout Europe the positive films to any one who chose to buy, stipulating, however, on the bill rendered, that it was a condition of sale that the film should not be resold or hired out for use, except in the country in which it was bought, nor exported, nor sold for export.

The defendants imported one of these positive films, which they purchased from a dealer in England, having first ascertained that there was no copyright for the photoplay in this country, and without notice of the stipulation that the same was not to be resold for export. This film they exhibited and hired out to others for the purpose of exhibition. Subsequent to the defendants' purchase the Nordisk Company copyrighted the photoplay in this country, receiving from the Copyright Office a certificate of registration as follows:

"This is to certify, in conformity with section 55 of the act to amend and consolidate the acts respecting copyright approved March 4, 1909, as amended by the Copyright Act of August 24, 1912, that the title, a description, and one print taken from each scene or act of the motion-picture photoplay not reproduced in copies for sale named herein, have been deposited in this office under the provisions of the said acts, and that registration for copyright for the first term of 28 years has been duly made in the name of Nordisk Film Co., Copenhagen, Denmark.

"Title of motion-picture photoplay: The Great Circus Catastrophe. Parts 1, 2, 3. By Nordisk Film Co.

"Title received Nov. 14, 1912.

"Description received Nov. 14, 1912.

"78 prints received Nov. 14, 1912.

"Entry: Class L. XXc, No. 110."

This copyright the Nordisk Company subsequently assigned to the complainant, which seized the defendants' film under section 25 of the Copyright Act of March 4, 1909 (35 Stat. 1081, c. 320 [Comp. St. 1913, § 9546]).

[1] The title of the Nordisk Company in England was its common-law right of property in the intellectual conception of the scenario of the play expressed in words and in the intellectual conception of the photoplay expressed in actions. It could perform the written play itself, or license others to perform it, without prejudice to its common-law ownership, and so it could itself perform and license others to perform the photoplay in the same way. Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480; Werckmeister v. American Lithographic Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591, affirmed 207 U. S. 284, 28 Sup. Ct. 72, 52 L. Ed. 208, 12 Ann. Cas. 595.

[2] When it sold a positive film, which was the only means of performing the play, it conferred the performing right on the purchaser and his assigns. No one, by virtue of that sale, would acquire the right to re-enact the play and take a negative of it, or make, if that could be done, a new negative from the positive film. This would be inconsistent with the Nordisk Company's common-law property in the photoplay and with the mere performing right which it had conferred on the owner of the film. But exercise of the performing right by one or by many purchasers of positive films would be entirely consistent with the Nordisk Company's common-law property in the play itself. The attempt, however, to annex a condition as to the use of the film after it was absolutely sold, was vain. Such conditions cannot be made to accompany an article throughout its changes of ownership. Bobbs-Merrill v. Strauss, 210 U. S. 340, 28 Sup. Ct. 722, 52 L. Ed. 1086, Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 31 Sup.

Ct. 376, 55 L. Ed. 502; Waltham Watch Co. v. Keene (D. C.) 202 Fed. 225, affirmed 209 Fed. 1007, 126 C. C. A. 668.

[3, 4] The Nordisk Company abandoned its common-law property in the United States when it took out the statutory copyright. Our law permitted it to copyright the scenario and the photoplay separately. It secured copyright for the latter under section 11 of the act of 1909, as amended in 1912 (Act Aug. 24, 1912, c. 356, 37 Stat. 488 [Comp. St. 1913, § 9532]) by depositing in the office, not the scenario of the play, but only the title, with a description of it, and two photo prints of parts of each act. Sale of positive films after copyright was as consistent with its statutory ownership as was the sale of films before copyright with its common-law ownership. But neither it nor its assigns as owner of the statutory copyright in this country, could repudiate the license it had given before copyright to the purchaser of the film in England and his assigns. Therefore the defendants cannot be treated as infringers.

We are entirely satisfied with the disposition the District Judge made of the damages and special allowance to counsel resulting from the seizure.[1]

The decree is affirmed.

1 NOTE.

The following is the opinion of Hough, District Judge, on the question of damages.

"A decision having been rendered dismissing this bill, the cause was again brought on before me (after notice to the surety on the seizure bond) in order to assess the damages caused to the defendant by the seizure, pursuant to the Copyright Act, of the film or reel containing the photoplay which is the subject of this suit. At the same time the matter of an allowance of a counsel fee to the successful party was laid before the court.

"The following matters of fact must first be decided, viz.: The condition of the film or reel at the time of seizure and at the present time; the nature of the employment of the reel at the time of seizure; the rate of such employment and its probable future employment.

"The reel was produced in court and examined by me. It is obviously in very bad physical condition. The celluloid is brittle and in many places cracked. This is in large part the result of its having been kept for a year without that special attention which is customary among business men. These articles should be kept in a damp and oily atmosphere. This has not been done.

"The reel, however, is otherwise in bad condition, in that it is much torn on the edges. The holes for the sprocket wheels by which the reel is passed before the projecting machine are torn and frayed, and this condition could not be brought about merely by disuse in a dry atmosphere. The condition of the reel at the time of seizure is testified to by Messrs. Spiegelthal, for complainant, and Oes, for defendant. I saw and heard all the witnesses. Having regard to the obvious present physical condition of the film, I am of the opinion that when it was seized, in April, 1913, it was not what Spiegelthal says it was, and was substantially what it is now, and was, therefore, worth no more than $80.

"There is no evidence to contradict Spiegelthal's testimony that for about two months before seizure he had succeeded in hiring out this film about 40 times at an average of $10 a day; but this statement must be taken in conjunction with his assertion that the film was a 'feature' and practically a new film. As above pointed out, this I do not believe, and therefore I am of opinion that he could not rely on getting more for such a film than the

reduced rate of $6 a day to which he testifies as being proper for inferior films.

"Likewise there is no testimony contradicting Spiegelthal's statement that at the time of seizure he had 'bookings' for this film for between two and three weeks. There is no evidence to show any certainty of occupation for the film after the expiration of that time. There is substantial uniformity among the witnesses that in some shape or another a film will last about a year, if (as Samwick says) 'it gets ordinary treatment and ordinary wear and tear.' It is my opinion from the physical appearance of the film that it had expended a good deal more than half its life at the time of seizure, and it was at that time, according to all the evidence in the case, between eight and nine months old.

"The defendants had obtained about 40 days of work for the film in between 2 and 3 months, and if it be permissible to infer future results from past performances, no more than about 50 future days of hiring could be expected for it. It follows that on the principles contended for by defendants, but on figures adopted by me from the evidence, the defendants are entitled to

The value of the reel at the time of seizure.............................. $ 80
Net proceeds (80 per cent. of gross receipts) for 60 days of hiring...... 288

—with interest from the assumed date when the reel would have been worn out, say July 15, 1913.

"The question of law remains as to whether these damages (assuming them to be proven) are legally recoverable. I feel quite sure that not many years ago any recovery beyond the market value of the film would have been denied. Undoubtedly, however, the tendency of the courts has been to relax the rule regarding recovery of damages.

"The method of relaxation has been to enlarge the rule in Hadley v. Baxendale, 9 Exch. 341, and to find, infer, or assume that many things were within the contemplation of the parties which a few years ago would have been thought too remote for any party to have perceived. Naturally these questions of damage arise most frequently in causes of contract, and I can add nothing to the line of modern thought expressed in Wakeman v. Wheeler, etc., Co., 101 N. Y. 205, 4 N. E. 264, 54 Am. Rep. 676, and In re Pennsylvania Steel Co., 198 Fed. 721, 117 C. C. A. 503. It seems to me that the same line of reasoning is applicable to any method of business preventing. A man gets damages for breach of contract really because he cannot do business along the lines that he intended. He ought to get the same damages, no matter how his business is prevented. It is no greater stretch of imagination to hold that a tort-feasor who prevents one from doing business has in mind the nature and incidents of that business than it is to hold that a contract breaker has in mind the nature and incidents of the business contracted for.

"It follows that the next query is: What kind of business was prevented by the seizure of this film? Reflection has only strengthened the belief that the business was that of giving a show or play. It really makes no difference that the play is mechanically produced. If there is no film, there is no play, and unless the play is projected upon a screen the idle film is worthless. The value of the film depends entirely upon the popularity of the play. Therefore I think the analogy between this case and preventing the giving of a dramatic performance is complete. The only previous decision that I have been able to find relating to damages for preventing dramatic performances is Schlesinger v. Bedford (1893) 28 Weekly Notes, 57. Though this decision is by a court of more than respectable authority, there is not much reasoning in it; but the method adopted, both in the trial court and the court of appeal, is, I think, in line with the findings I have made and with what I believe to be the trend of modern authority.

"The defendants may therefore take a decree for damages as hereinabove assessed. The counsel fee provided for in the Copyright Act is merely a revival of old practice. I am not informed that it is known what reasons induced Congress to revive old practice in respect of copyrights only. Having, therefore, nothing but the text of the law to guide me, I do not regard the

congressional provision as punitive, and I assume that the intent of Congress was merely to compensate counsel for professional labors.

"Consequently I inquire, not only into the extent of professional labor known to the court, but the importance of the litigation, both as to the principle involved and the pecuniary magnitude of the case. In my judgment the professional labor in this matter was out of all proportion to the principle or the amount of money involved. Whenever the Legislature makes a new statute on an old subject, it is a hard matter to distinguish between new legislation and laws re-enacted. Therefore, from this standpoint, Mr. Frank's labors have been great.

"On the other hand, if I am right in my interpretation of the Copyright Act, the future importance of this litigation is but small, and the amount of money involved is certainly trivial. Having looked at the matter from these viewpoints, I conclude that it would be wrong for the court to award to defendants' counsel what it believes would be a larger fee than counsel could charge for his services in such a case had Congress not passed the statute in question. Of course this is delicate ground, for the lack of uniformity among lawyers in respect of their professional charges is notorious. But any judge must be guided by his own professional faith, and mine is, as applied to this case, that no lawyer could charge a client for this case alone more than $250.

"It may well be that some association or commercial union regards this case as important for their common interest, but that should not affect decision. If persons other than the legal parties to a cause are interested in its event, let them pay. The counsel fee awarded is therefore $250."