**WARNER BROS. PICTURES, Inc. et al. v. COLUMBIA BROADCASTING SYSTEM, Inc. et al.**

Civ. No. 8265.

United States District Court
S. D. California, Central Division.

Dec. 28, 1951.

Freston & Files, Gordon L. Files, Los Angeles, Cal., for plaintiffs.

Crider, Runkle & Tilson, Clarence B. Runkle, Los Angeles, Cal., for Columbia Broadcasting System, Inc., William Spier, The Wildroot Company, Inc., Regis Radio Corp., Batten, Barton, Durstine & Osborn, Inc., William Robert Tallman and Joe Eisinger.

Laurence W. Beilenson, William Berger, Beverly Hills, Cal., Leonard Zissu, New York City, for Dashiell Hammett.

MATHES, District Judge.

Plaintiff Warner Bros. Pictures, Inc., as owner of the motion picture, radio and television rights in the copyrighted work "Maltese Falcon," seeks by this action, see Hammett v. Warner Bros. Pictures, 2 Cir., 1949, 176 F.2d 145, an injunction and damages for alleged copyright infringement and unfair competition. 28 U.S.C. § 1338 (a, b); Hurn v. Oursler, 1938, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Musher Foundation v. Alba Trading Co., 2 Cir., 1942, 127 F.2d 9, certiorari denied, 1942, 317 U.S. 641, 63 S.Ct. 33, 87 L.Ed. 517. In furtherance of convenience a separate trial of the issue of liability was ordered, and the case has been tried and submitted

for decision as to that issue. Fed.Rules Civ.Proc. rule 42(b), 28 U.S.C.A.

The material facts are these: "Maltese Falcon," Dashiell Hammett's fiction story of exploits of private detective Sam Spade, was copyrighted in 1929 and published in installments in five issues of Black Mask Magazine. These copyrights were assigned by Pro-Distributors Corporation, publisher of the magazine, to Alfred A. Knopf, Inc., joined as a party plaintiff. See Fed. R.Civ.P. rule 19(a), 20; Independent Wireless Telegraph Co. v. R. C. A., 1926, 269 U.S. 459, 468, 469–474, 46 S.Ct. 166, 70 L.Ed. 357; L. C. Page & Co. v. Fox Film Corp., 2 Cir., 1936, 83 F.2d 196. Defendant Hammett had previously granted plaintiff Knopf, by instrument dated March 29, 1928, "the sole and exclusive right to publish the work * * * in book form" and also the additional rights of "second serialization, selection, syndication, translation, dramatic, motion picture, radio broadcasting and all other rights excepting first serial."

Plaintiff Warner derives its rights in the copyrighted work under an instrument executed June 23, 1930 by Knopf and Hammett as "Owners" and Warner Bros. as "Purchaser."

As disclosed by this document, Warner as "Purchaser" was granted the following rights *inter alia* "in and to that certain story, hereinafter called 'writings,' entitled 'MALTESE FALCON' * * *: 1. (a) the exclusive * * * motion picture rights, including, common law and statutory copyright in the same * * * together with all benefits of the copyrights in such writings, the title and the theme thereof, and of all remedies held thereunder, with respect to such motion picture rights; (b) the exclusive right to make motion picture versions thereof * * * including the exclusive right to show * * * photographs in motion, representing scenes or action taken from or based upon said writings, or any adaptation thereof; (c) the exclusive right to record and reproduce language, speech, songs, music, dancing, choreography and other sounds in connection with * * * the production and exhibition of photoplays based upon such writings * * *; (d) the exclusive right for the purpose of such sound records and photoplays, to adapt, use, dramatize, arrange, change, transpose, make musical versions of, add to, interpolate in and subtract from said writings, the language, title and dialogue thereof * * *; (e) the exclusive right to record such writings, language and dialogue and such adaptations, dramatizations, arrangements, change * * * and interpolations on sound records and to reproduce the same from such sound records in synchronism with and/or separately from such photoplays * * *; (f) the right in the writings for production and use upon the spoken stage * * * is reserved to the Owners, but all other now or hereafter existing dramatic, exhibition or other presentation rights in the writings, and without limiting the generality of the foregoing, including talking motion picture rights * * * as well as the right to transmit and exploit scenes and pictures taken or adapted from or based upon said writings, the language, title and dialogue thereof, by radio, television or otherwise, together with the right to transmit and reproduce by radio, television or otherwise, the writings, the language, title and dialogue thereof and the sound records herein referred to in connection with the broadcasting of said motion picture versions * * * are granted exclusively to the Purchaser * * * [and] 12. The Owners warrant and agree that they will not cause or allow or sanction any publication or dramatization of said writings or any arrangement, or revision or reissue thereof in any form in any parts of the world, without first granting to the Purchaser, without further consideration, the silent and talking motion picture rights and the mechanical and recording and reproducing rights (and all the rights set forth in paragraph (1) hereof) and in and to any such arrangement, revision or reissue above named."

Concurrently with the execution of the above grant, co-plaintiff Knopf, by instrument executed for recordation purposes [see 17 U.S.C. § 30], assigned to plaintiff Warner Bros. the "motion picture rights

* * * as well as radio broadcasting and television rights" in "Maltese Falcon."

Acting under these instruments of grant and assignment, Warner Bros. made three copyrighted motion-picture versions of the story: one entitled "Maltese Falcon" released in 1931; one entitled "Satan Met a Lady" released in 1936; and one again entitled "Maltese Falcon" released in 1941.

In 1932, some two years after the foregoing transfers, defendant Hammett wrote and had published three original stories entitled "A Man Called Spade," "Too Many Have Lived" and "They Can Only Hang You Once." Sam Spade was the name of the principal character in each of these 1932 stories, which were published again in 1944 and later in a collection called "The Adventures of Sam Spade and Other Stories by Dashiell Hammett."

Years later, by instrument dated May 15, 1946 defendant Hammett granted to Rosenberg and White "the sole and exclusive right to the use in the fields of radio, television, motion pictures * * * of a fictional character originated, conceived and created by me known as Sam Spade." Defendant Regis Radio Corporation later became assignee of "certain rights" so granted, and pursuant to this transfer the radio show "The Adventures of Sam Spade," written by defendants Tallman, Doud, and Eisinger, was produced and broadcast as a weekly half-hour program almost continually from 1946 to 1950. With the exception of "The Kandy Tooth," which was first presented in two parts and later broadcast on an hour-long program called "Suspense," a single "caper" of Sam Spade was presented on a half-hour broadcast each week.

It is these radio broadcasts which plaintiff Warner claims constitute infringement of copyright and unfair competition. The primary ground upon which these claims are rested is the contention that Warner has the exclusive right to use the characters portrayed in "Maltese Falcon"—and thus to create sequels to the work—in the fields of motion pictures, radio and television by virtue of the grant to Warner as "Purchaser" under the above quoted provisions of the agreement of June 23, 1930.

The words of the instrument itself are that "Owners" Knopf and Hammett granted "Purchaser" Warner Bros. rights "in and to that certain story, hereinafter called 'writings,' entitled 'Maltese Falcon'" as follows: [1] "the exclusive * * * motion picture rights * * * together with all benefits of the copyrights in such writings, the title and theme thereof"; [2] "the exclusive right to record and reproduce language * * * and other sounds in connection with * * * the production and exhibition of photoplays based upon such writings"; and [3] "the exclusive right to record such writings * * * and * * * adaptations [and] dramatizations on sound records and to reproduce the same"; provided however that "the right in the writings for production and use upon the spoken stage * * * is reserved to the Owners, but [4] all other now or hereafter existing dramatic, exhibition or other presentation rights in the writings * * * including * * * the right to transmit and exploit scenes and pictures taken or adopted from or based upon said writings * * * by radio, television or otherwise * * * are exclusively granted to the Purchaser * * *."

Thus, insofar as material here, the instrument itself—the source from which the quantum of rights conveyed to Warner Bros. must be ascertained—is completely silent as to whether or not the author retained any right to use the characters of "Maltese Falcon" in other works.

It has long been common practice among detective-fiction writers to make use of the same central and supporting characters in subsequent works. This pattern was set by the first of modern detective-fiction writers, Edgar Allen Poe, who depicted the exploits of amateur detective Monsieur C. Auguste Dupin in a series of works: "The Murders of Rue Morgue," "The Mystery of Marie Roget," and "The Purloined Letters." See Haycraft, Murder for Pleasure: The Life and Times of the Detective Story (1941) 11, 27.

Poe's start of a "series detective" was given permanence by Sir Arthur Conan Doyle in his creation of Sherlock Holmes. See Boucher, Four and Twenty Bloodhounds, foreword p. v (1950). By the time "Maltese Falcon" was first published, the series detective had become a common and recognized device in detective fiction. See MacGowan, Sleuths, foreword p. x (1931). A present-day example is Erle Stanley Gardner's repeated use of the fictional character Perry Mason.

Thus it became custom that, in the absence of express agreement to the contrary, an assignment of copyright in this field of writing did not include the right to exclusive use of the characters portrayed in the copyrighted work. In other words, the author customarily retained so-called character, series or sequel rights in the copyrighted work. The existence of this custom is one of the surrounding circumstances which aids interpretation of the instruments involved at bar.

Moreover the conduct of the parties furnishes indicia that they acted in the light of this custom in the transactions here. In 1928 Hammett granted Knopf "the sole and exclusive right to publish the work ["Maltese Falcon"] * * * in book form," and the additional rights of "second serialization, selection, syndication, translation, dramatic, motion picture, radio broadcasting and all other rights excepting first serial." The extent of Knopf's rights in the publication field thus were fully as broad as those acquired by Warner Bros. in the motion picture, radio and television fields. That Warner Bros. so viewed the scope of Knopf's rights is borne out by the fact already noted that Knopf alone signed the "Assignment of Copyright" executed for recordation purposes, and Warner Bros. accepted as sufficient the assignment so executed.

Thereafter in the face of what had been granted to Knopf, as well as what had been granted to Warner Bros., Hammett wrote and caused to be published in 1932—subsequent to release of the first Warner Bros. motion picture "Maltese Falcon"—three original short stories in which the principal character was Sam Spade of "Maltese Fal-con" fame. This open and notorious assertion by Hammett of his claimed right as author to employ in subsequent works characters depicted in the copyrighted work was not challenged by either Knopf or Warner Bros.

Furthermore the instruments in question at bar contain no mention whatever of the right—often of great value [see Haycroft, op. cit. supra 231]—to use the characters of "Maltese Falcon" in later works.

By contrast, other literary rights are expressly dealt with. As an example, in paragraph 1(a) Warner Bros. is granted "the title and the theme" of the "writings * * * with respect to * * * motion picture rights." See Becker v. Loew's, Inc., 7 Cir., 1943, 133 F.2d 889, certiorari denied, 1943, 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720, rehearing denied, 1943, 320 U.S. 811, 64 S.Ct. 30, 88 L.Ed. 490; Warner Bros. Pictures v. Majestic Pictures Corp., 2 Cir., 1934, 70 F.2d 310. And in paragraph 12 Hammett and Knopf agreed "that they will not * * * allow or sanction any * * * dramatization of said writings or any arrangement, or revision or reissue thereof * * * without first granting to the Purchaser [Warner Bros.] * * * talking motion picture rights and the mechanical recording and reproducing rights (and all the rights set forth in paragraph (1) hereof) and in and to any such arrangement, revision or reissue above named."

The instruments required to be interpreted here were executed in New York, and the parties have stipulated that New York law should govern interpretation. See Equitable Life Assurance Society v. Clements, 1891, 140 U.S. 226, 232, 11 S.Ct. 822, 35 L.Ed. 497; Scudder v. Union National Bank, 1875, 91 U.S. 406, 411, 23 L. Ed. 245; Cal.Civ.Code, § 1646; Palmer v. Atchison, T. & S. F. Ry. Co., 1894, 101 Cal. 187, 35 P. 630; Progresso S. S. Co. v. St. Paul Fire & Marine Ins. Co., 1905, 146 Cal. 279, 79 P. 967; cf. Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 240, 51 S.Ct. 111, 75 L.Ed. 312.

Under New York law, express provisions of the grant concededly would supersede custom; but "Evidence of custom

is permitted for the purpose of qualifying the meaning of a contract where otherwise ambiguous * * * and of supplying omissions under certain circumstances which have occurred in the agreement of the parties." Western Union Co. v. American Communications Ass'n, 1949, 299 N.Y. 177, 86 N.E.2d 162, 166; Gravenhorst v. Zimmerman, 1923, 236 N.Y. 22, 139 N.E. 766, 770, 27 A.L.R. 1465.

Circumstances surrounding execution of these instruments, O'Neil Supply Co. v. Petroleum Heat & Power Co., 1939, 280 N.Y. 50, 19 N.E.2d 676; Fleischman v. Furgueson, 1918, 223 N.Y. 235, 119 N.E. 400; Berry Harvester Co. v. Walter A. Wood Mowing & Reaping Mach. Co., 1897, 152 N.Y. 540, 46 N.E. 952—particularly the circumstance that the subject was entirely omitted— strongly indicate intent not to vary the custom which reserves to the author the right to employ in subsequent writings characters portrayed in the copyrighted work.

■ Subsequent conduct of the parties themselves serves to strengthen this view. Brooklyn Public Library v. City of New York, 1929, 250 N.Y. 495, 166 N.E. 179; Columbus Spa v. Star Co., 1926, 216 App. Div. 218, 214 N.Y.S. 653. Furthermore, established rules of construction require that ambiguities in a contract be resolved against the party who prepared the instrument—in this case Warner Bros. See O'Neil Supply Co. v. Petroleum Heat & Power Co., supra, 1939, 280 N.Y. 50, 19 N.E.2d 676; Hunt v. United Bank & Trust Co., 1930, 210 Cal. 108, 116, 291 P. 184.

It is to be remembered that defendant Hammett entered upon the transactions in question possessed of all common-law rights incident to authorship of a literary work. See Wheaton v. Peters, 1834, 8 Pet. 591, 654–658, 33 U.S. 591, 654–658, 8 L. Ed. 1055; Holmes v. Hurst, 174 U.S. 82, at page 85, 19 S.Ct. 606, 43 L.Ed. 904; Universal Film Mfg. Co. v. Copperman, 2 Cir., 1914, 218 F. 577, 579, certiorari denied, 1914, 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433; Supreme Records v. Decca Records, D.C.S.D.Cal.1950, 90 F.Supp. 904, 906–908. A portion of those rights the author granted to the publishers of Black Mask Magazine; another portion to Knopf. And later Knopf and Hammett joined to grant Warner Bros. not only a portion of the rights secured by registration of copyright pursuant to statute, 17 U.S.C. § 1(a, b, d), but also any common-law rights of the author to use of "the title and the theme * * * with respect to * * * motion picture rights." See Dellar v. Samuel Goldwyn, Inc., 2 Cir., 1945, 150 F.2d 612, certiorari denied 327 U.S. 790, 66 S.Ct. 802, 90 L. Ed. 1016, rehearing denied, 1946, 328 U.S. 878, 66 S.Ct. 1020, 90 L.Ed. 1646; Becker v. Loew's, Inc., supra, 133 F.2d at pages 891–893; Shipman v. R. K. O. Radio Pictures, 2 Cir., 1938, 100 F.2d 533, 538; Warner Bros. Pictures v. Majestic Pictures Corp., supra, 70 F.2d at pages 311–312.

It is true of course, broadly speaking, that "a statutory copyright operates to divest a party of the common-law right." Jewelers' Mercantile Agency v. Jewelers' Weekly Publishing Co., 1898, 155 N.Y. 241, 247, 49 N.E. 872, 873, 41 L.R.A. 846. But this does not mean that the author of a copyrighted work is divested of all legal rights incident to authorship other than those expressly protected by the copyright statutes.

■■ As the Court of Appeals explained in Bobbs-Merrill Co. v. Straus, 2 Cir., 1908, 147 F. 15, 18–19, affirmed, 1910, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086: "The owner of the common-law copyright has a perpetual right of property and the exclusive right of first general publication, and may, prior thereto, enjoy the benefit of a restricted publication without forfeiture of the right of general publication. Thus, he may communicate the contents of his work under restrictions without forfeiture of the right. * * *

"On the other hand, the surrender of the perpetual right is a condition precedent to the enjoyment of statutory copyright. The common-law right is lost by the general publication or unrestricted sale of a single copy. The statute protects the owner in the unrestricted publication and sale of all copies during the term of the copyright. * * * Where the owner of the common-law copyright elects to substitute the protection of the statute for that of the common law, he, upon publication, abandons or

17

surrenders his common-law rights, including said right of limited publication, in exchange for the statutory right, the exclusive right to multiply copies."

Upon affirming the decree of the Court of Appeals in Bobbs-Merrill Co. v. Straus, supra, the Supreme Court said, 210 U.S. at page 347, 28 S.Ct. at page 725: "While the nature of the property and the protection intended to be given the * * * author as the reward of genius or intellect in the production of his book or work of art is to be considered in construing the act of Congress, it is evident that to secure the author the right to multiply copies of his work may be said to have been the main purpose of the copyright statutes."

A classic statement of the rule in question is that: "The rights do not co-exist in the same composition; when the statutory right begins the common-law right ends." [Ibid.]

Neither the rationale of the rule nor the language nor the purpose of the statute requires that the author relinquish any common-law right other than the perpetual right to restrict publication of the work. On the other hand it would seem that considerations of reason and policy argue against divesting the author of other common-law rights incident to authorship. Accordingly the courts have recognized that statutory copyright does not divest the author of such non-statutory or common-law rights as he may have to exclude others from making use of the title or the characters. See Becker v. Loew's, Inc., supra, 133 F.2d at page 891; Warner Bros. Pictures v. Majestic Pictures Corp., supra, 70 F.2d at pages 311–312; Nichols v. Universal Pictures Corp., 2 Cir., 1930, 45 F.2d 119, 121, certiorari denied, 1931, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795. "Any civil right not unlawful in itself nor against public policy, that has acquired a pecuniary value, becomes a property right that is entitled to protection as such. The courts have frequently [recognized] this right. They have never refused to do so when the facts show that the failure to exercise equitable jurisdiction would permit unfair competition in trade or in any matter pertaining to a property right." Fisher v. Star, 1921, 231 N.Y. 414, 420, 132 N.E. 133, 137, 19 A.L.R. 937.

Recognition and protection of such rights in intellectual product is eminently just in view of the statutory provision that the "works for which copyright may be secured * * * shall include all the writings of an author", 17 U.S.C. § 4, and the fact that title and characters are held not to be included in the monopoly granted by the copyright statutes. See Becker v. Loew's, Inc., supra, 133 F.2d at page 891; Detective Comics v. Bruns Publications, 2 Cir., 1940, 111 F.2d 432; Nichols v. Universal Pictures Corp., supra, 45 F.2d at page 121; National Picture Theatres v. Foundation Film Corp., 2 Cir., 1940, 266 F. 208, 210; cf. International News Service v. Associated Press, 1918, 248 U.S. 215, 234–235, 242, 246–248, 39 S. Ct. 68, 63 L.Ed. 211; R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 1940, 114 F.2d 86, 88–90, certiorari denied, 1940, 311 U.S. 712, 61 S. St. 393, 85 L.Ed. 463; Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 1940, 114 F.2d 80, 83–84, affirmed, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Fitch v. Young, D.C.S.D.N.Y.1916, 230 F. 743, 744, affirmed, 2 Cir., 1917, 239 F. 1021; Universal Film Mfg. Co. v. Copperman, supra, 218 F. at page 579.

While expressly granting the author's common-law rights to make use of the title "Maltese Falcon" in respect to "motion picture rights," the instrument of transfer or conveyance as previously noted did not mention the author's common-law rights to make use of the characters of his creation in situations as yet "unpublished", see 17 U.S.C. § 2. Thus Hammett retained the right to use the characters of "Maltese Falcon" in subsequent works. And he was entitled to license third persons to use such characters. Cf. Hill v. Whalen & Martell, D.C.1914, 220 F. 359; Fisher v. Star, supra, 231 N.Y. 414, 132 N.E. 133, 19 A.L.R. 937.

But the right of an author or his licensee to use the characters of a copyrighted work does not protect against an action for infringement of the copyright, if the characters are so employed in subse-

quent works as to invade the copyright monopoly. Next to be considered then is Warner's contention that the radio broadcasts of "The Adventures of Sam Spade" infringe Warner's copyrights of "Maltese Falcon" in the fields of motion pictures, radio, and television.

Section 1 of Title 17 of the United States Code provides that "Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

"(b) To * * * make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; * * *

"(d) To * * * exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever * * *."

■ The copyright owner's exclusive right to "dramatize" a non-dramatic work includes monopoly in the presentation of such a work in dramatic form on a radio broadcast. Kalem Co. v. Harper Bros., 1911, 222 U.S. 55, 32 S.Ct. 20, 56 L.Ed. 92.

The validity of the copyrights at bar is conceded. There remain, then, two questions: First, whether defendants actually used the copyrighted work; and second, if so, whether theirs was a "fair use." Sheldon v. Metro-Goldwyn Pictures, 2 Cir., 1936, 81 F.2d 49, 54.

■ Almost two hundred scripts of radio broadcasts of "The Adventures of Sam Spade" were received in evidence. It is necessary, however, to discuss only one of these, since plaintiffs state that defendants' broadcast of "The Kandy Tooth" episode presents the strongest instance in support of the claim of infringement. Summaries of "The Kandy Tooth" as broadcast and of the novel "Maltese Falcon" are included in an appendix hereto. "The right * * * secured by the copyright act is not a right to the use of certain words, because they are the common property of the human race, and are as little susceptible of private appropriation as air or sunlight; nor is it the right to

ideas alone, since in the absence of means of communicating them they are of value to no one but the author. But the right is to that arrangement of words which the author has selected to express his ideas". Holmes v. Hurst, supra, 174 U.S. 82, 86, 19 S.Ct. 606, 607, 43 L.Ed. 904.

■ "Defendants were entitled to use, not only all that had gone before, but even the [copyrighted work] itself, if they drew from it only the more general patterns; that is, if they kept clear of its 'expression.'" Sheldon v. Metro-Goldwyn Pictures Corp., supra, 81 F.2d at page 54; Christianson v. West Pub. Co., 9 Cir., 1945, 149 F.2d 202, 203; Twentieth Century Fox v. Stonesifer, 9 Cir., 1944, 140 F.2d 579; Yankwich, Originality in the Law of Intellectual Property, 1951, 11 F.R.D. 457. As Mr. Justice Holmes put it: "Others are free to copy the original. They are not free to copy the copy." Bleistein v. Donaldson Lithographing Co., 1903, 188 U.S. 239, 249, 23 S.Ct. 298, 299, 47 L.Ed. 460.

Plaintiff Warner points to numerous similarities between situations arising in the broadcasts and those occurring in the book. Admittedly, defendants referred to the novel "Maltese Falcon" to obtain accurate characterizations of Sam Spade and the lesser characters of the work. They drew upon the public domain, including the Bible, for the plot situations presented in the broadcasts. Although there is similarity of incident between the "Maltese Falcon" and "The Kandy Tooth," the incidents which are similar do not perform like dramatic functions in the two works. Neither is there similarity of sequence of incident. Cf. Universal Pictures Co. v. Harold Lloyd Corp., 9 Cir., 1947, 162 F.2d 354.

■ The line between "fair use" and infringement "wherever it is drawn, will seem arbitrary * * *." Nichols v. Universal Pictures, supra, 45 F.2d at page 122. However, the reasons given above require the conclusion that defendants' series of broadcasts have "kept clear" of the "expression" of the copyrighted work, and hence do not infringe Warner's copyrights of "Maltese Falcon" in the fields of mo-

tion picture, radio and television. Cf. Sheldon v. Metro-Goldwyn Pictures Corp., supra, 81 F.2d 49.

Finally, Warner contends that the broadcasts of "The Adventures of Sam Spade," as well as the broadcast of "The Kandy Tooth" on the program "Suspense," constituted acts of unfair competition.

The essence of the argument is that defendants consciously sought to imitate the voices of the actors who performed in the 1941 motion picture version of "Maltese Falcon," namely, Humphrey Bogart as Sam Spade, Sydney Greenstreet as Caspar Gutman, and Peter Lorre as Cairo. But there is no evidence that the listening public thought of the broadcasts as anything other than the adventures of a fictional character named Sam Spade. Certainly there is nothing to indicate that the public considered the broadcasts as portraying Humphrey Bogart in the role of detective Sam Spade.

Here, then, there is neither "deception of the public," nor "palming off," nor other practice or conduct which can properly be characterized as unfair competition. Cf. International News Service v. Associated Press, supra, 248 U.S. at pages 236, 246, 39 S.Ct. at pages 71, 75; Becker v. Loew's, Inc., supra, 133 F.2d at page 891; Lone Ranger, Inc., v. Cox, 4 Cir., 1942, 124 F.2d 650; Warner Bros. Pictures v. Majestic Pictures Corp., supra, 70 F.2d at pages 311–312; Fisher v. Star, supra, 231 N.Y. at page 420, 132 N.E. at page 137.

Accordingly, judgment is now ordered in favor of defendants. Attorneys for defendants will submit findings of fact, conclusions of law and judgment pursuant to local rule 7 within ten days.

### Appendix
### Summary of "Maltese Falcon"

The story "Maltese Falcon" opens in San Francisco in the offices of Spade and Archer, detectives, with Spade's secretary, Effie Perine, announcing a Miss Wonderly in to see Spade.

Miss Wonderly wants them to help her get her sister away from Thursby, with whom her sister had run away. Archer, Spade's partner, agreed to follow Thursby to learn the sister's whereabouts. That night, while Archer is on the job, both he and Thursby are killed.

Lieut. Dundy and Sergt. Polehouse of the San Francisco police suspect Spade of Thursby's murder, and confront him with their reasons. Spade treats the two policemen in a contemptuous and high-handed fashion. They get nowhere with their interrogation of Spade, but abstain from arresting him.

The next morning Miss Wonderly summons Spade. She reveals her true name as Brigid O'Shaughnessy and confesses the falsity of the story about her sister. She admits fear of physical harm and entreats Spade to "be generous" and help her. He agrees to help her after she had given him all but $25 of her last $500.

Spade then sees his lawyer to find out if he could be forced to reveal confidences between himself as a detective and his clients. And just to be safe, Spade and his lawyer went to see the "right people" about it.

That evening a Joel Cairo calls on Spade at Spade's office. Cairo wants Spade to help him recover the black figure of a bird, and offers $5,000 for Spade's services.

As Spade comes out of his building he notices he is being followed. But Spade easily evades his pursuer, and goes to see Brigid.

Spade tells her of Cairo's visit and the offer of $5,000 for return of the black bird. This news upsets her, since she somehow had assumed Spade would get the black bird for her. She states her inability to offer $5,000, but asks Spade if he could be bought with her body. Spade replies that he will think it over.

The following day Spade receives a call from Gutman, the fat man, and Spade goes immediately to Gutman's suite. Gutman, Cairo and Wilmer, the gun-boy who had followed Spade, are there. Spade lays down his terms for returning the black bird and storms out.

That afternoon Wilmer comes to Spade and tells Spade to accompany him to see

Gutman. Before Wilmer and Spade get to Gutman's rooms Spade neutralizes Wilmer by disarming him. At the meeting Gutman discloses the immense intrinsic value of the bird. The bird was a gold falcon encrusted with jewels reputedly given by the Knights of Rhodes to Emperor Charles V·of Spain in the early 16th Century.

The Falcon was ultimately traced to one Kemidov in Constantinople, from whom Gutman had attempted to procure the bird. Gutman now suspects that Brigid succeeded where he failed.

Terms for Spade's services in returning the Falcon are agreed upon. Gutman drugs Spade rendering him unconscious for several hours, so that Spade will be out of the way when Gutman and his men meet a ship from the Far East aboard which the Falcon is reported to be.

That night a man who turns out to be the captain of the ship staggers into Spade's office carrying a small package, and dies. The package contains a figure of a black bird. Spade checks the package in a baggage room and mails the checks to his office. As he reaches his apartment he finds Brigid in the hall. They enter the apartment and there are Gutman, Cairo and Wilmer.

Spade uses his knowledge of the whereabouts of the Falcon to bargain for his safety and acceptance of his terms of delivery. He induces Gutman to let Wilmer be the "fall guy" for the murders of Thursby and the ship captain. Gutman then reveals that Wilmer in fact did commit the murders.

In the morning Spade phones Effie to get the baggage checks and bring the package to his apartment. There Spade and Gutman open the package only to find that the bird is made of lead coated with black enamel.

Gutman then produces a small gun and regains $9,000 of the $10,000 he gave Spade. Gutman and Cairo leave, Wilmer having escaped earlier after he was nominated as the "fall guy."

Spade immediately notifies the police, but Wilmer has killed Gutman before the police pick them up. Spade accuses Brigid of murdering Archer, Spade's former partner. She reminds Spade of their tender moments together, but he refuses to "play the sap" for her, and turns her over to the police.

Summary of "The Kandy Tooth"

"The Kandy Tooth" unfolds in the form of a report from Spade to Lieut. Dundy of the San Francisco police.

Spade received a telegram from Caspar Gutman, who Spade thought had been killed by Wilmer in the "Maltese Falcon" case. The telegram announced Gutman's arrival in San Francisco, and cryptically warned Spade about a hidden tooth. As Spade read the telegram, his secretary, Effie Perine, ushered Lawrence Laverne, D.D.S., into the office. Laverne wished to engage Spade to get a bridgework from the mouth of a Mr. Julius and wanted Spade to use force if necessary. Spade peremptorily brushed Laverne off and went to lunch. There Miss Hope Laverne introduced herself and inquired of the whereabouts of her brother Lawrence. However, she seemed more interested in finding Julius than Lawrence, and suggested that the best way to find Lawrence was to find Julius.

Spade learned of Julius' address, but upon going there found only Lawrence Laverne, thoroughly beaten up. Down on the street Laverne felt faint and Spade took him to the nearest place where he could sit down, a newsreel theatre. One subject shown on the newsreel was an oriental celebration in Kandy, Ceylon, where pilgrims were gathering to view the jeweled casket containing the legendary relic of Buddha himself. Sight of this put Laverne completely at loose ends, and so Spade took him to Spade's apartment.

A few drinks relaxed Laverne's mind and tongue. He explained to Spade that he was in Lisbon, doing all right as a dentist in the diplomatic colony until he met this horrid girl with her wild schemes. He related that the tomb of Dom Constantino, · Portuguese Viceroy 500 years ago, had been violated and that soon afterwards Gutman brought him a yellow old tooth and wanted it put in Julius' bridgework.

The tooth had been taken from Dom Constantino's skeleton. But Spade overplayed the drinks and Laverne passed out before completing the story.

While Laverne was still asleep Hope called expressing fear for her personal safety and seeking Spade's help. As Spade was leaving his building he had an altercation with a callow-faced punk. Spade enjoyed an early-round success, but the punk broke away, and as Spade pursued him down a dark alley, Spade was rendered unconscious by a blow from behind.

Spade awakened in Gutman's rooms in the presence of Gutman, Cairo, and the punk, Marvin, Wilmer's younger brother.

Spade and Gutman haggled over the price to be paid Spade for delivering Julius' bridgework. Spade demanded half of whatever the tooth brought Gutman. Gutman refused.

Spade returned home to find Lieut. Dundy in his apartment. Laverne had been killed; Spade was arrested for the killing and bail set at $20,000.

A man calling himself Dom Constantino, descendant of the Viceroy who died in the the 16th century, put up the $20,000 bail. In exchange for the amount of bail, he wanted the tooth that had been taken from the dead Viceroy's skull.

Meanwhile Hope had learned of Julius' whereabouts and picked up Sam to take him there. But Julius, in mortal fear of being taken alive, committed suicide before they could reach him.

Sam went back alone to see Gutman. Gutman explained that Buddha's tooth had been taken from India by Dom Constantino in the 16th century, that the same tooth was now in Julius' bridgework, and that the Buddhists would pay a fabulous sum for return of the tooth. For $10,000 Sam agreed to produce Julius' bridgework in which the tooth had been placed by Laverne.

Delivery was to be made at Spade's apartment at a specified time. Dom Constantino was notified. Gutman, Cairo and Marvin were there. Dom Constantino also arrived. A package was delivered by Mrs. Julius, whom Spade had seen after Julius' death. To the surprise of all but Spade the package contained nothing but the ashes of Julius, including the tooth. Marvin and Constantino, who was actually Kemidov referred to in the "Maltese Falcon" killed each other in a gunfight.

Gutman and Cairo were momentarily chagrined over the loss of the tooth but immediately made plans to go to "Samark." Then with reticence Spade turned Hope over to the police, but put up the amount of her bail so that he could be with her.