**RED BARON—FRANKLIN PARK, INC.; Fun Factories of Ohio, Inc., Plaintiffs–Appellees,**

**v.**

**TAITO CORPORATION; Taito American Corporation, Defendants–Appellants,**

**and**

**American Amusement Machine Association, Defendant,**

**Recording Industry Association of America, Inc.; Amusement & Music Operators Association, Inc.; American Amusement Machine Association, Amici Curiae.**

**No. 88–1368.**

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1989.

Decided July 18, 1989.

As Modified on Denial of Rehearing and Rehearing In Banc Sept. 5, 1989.

Jack Charles Berenzweig (Jerome Gilson, William, Brinks, Olds, Hofer, Gilson & Lione, Ltd., Chicago, Ill., Jeffery M. Cross, Deborah S. Pardini, Ross & Hardies, Chicago, Ill., Joseph M. Killeen, Rogers & Killeen, Alexandria, Va., on brief), for defendants-appellants.

Richard Harvey Stern, Washington, D.C., for plaintiffs-appellees.

Stanley Rothenberg, Moses & Singer, New York City, on brief, for amicus curiae, Recording Industry Ass'n of America, Inc.

Donald M. Barnes, Salvatore A. Romano, Doris E. Long, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., on brief, for amicus curiae, American Amusement Machine Ass'n.

Elroy H. Wolff, Gary I. Resnick, Sidley & Austin, Washington, D.C., on brief, for amicus curiae, Amusement & Music Operators Ass'n, Inc.

Before WINTER, PHILLIPS and CHAPMAN, Circuit Judges.

HARRISON L. WINTER, Circuit Judge:

As part of more extensive federal and state antitrust litigation which is not before us, Red Baron—Franklin Park, Inc. and Fun Factories of Ohio, Inc. (collectively "Red Baron"), as plaintiffs, and Taito Corporation and Taito America Corporation (sometimes collectively "Taito" and sometimes "Taito America"), as defendants, by petition for declaratory judgment litigated the question of whether Red Baron infringed Taito's copyright in a video game known as "Double Dragon," when Red Baron imported the game, and installed it in its video arcades for use by the public for profit. The district court ruled that Red Baron did not infringe and Taito appeals.

We reverse and remand for further proceedings.

## I.

Taito is a Japanese corporation engaged in the business of selling electronic video games, including electronic printed circuit boards which embody games and are used

in coin-operated video game units. Video games "can roughly be described as computers programmed to create on a television screen cartoons in which some of the action is controlled by the player." *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852, 853 (2 Cir.1982). Double Dragon is such a game. A video game unit consists of an electronic printed circuit board, a television monitor, a cabinet and a coin mechanism. When the component parts are connected and an electric current, activated by the insertion of the proper coin, run through the machinery, the game's audiovisual images appear on the television screen.

Taito has registered Double Dragon in the United States Copyright Office—Registration No. PA 327–710, issued June 26, 1987—and it has granted its wholly owned subsidiary, Taito America, an exclusive United States license in all of its copyright rights in Double Dragon.

Red Baron operates arcades where it makes available to the public for play upon payment of a set fee various video game units, including units fitted with Double Dragon circuit boards. Red Baron has no license from Taito or Taito America to use the Double Dragon circuit boards for profit nor did it obtain these circuit boards from Taito or Taito America. Rather, it obtained them in the "parallel" or "gray market," which is to say, that it purchased used circuit boards abroad and imported them without Taito's consent, at a cost less than the cost of a new unit purchased from Taito in the United States.[1] Taito had, of course, originally sold the circuit boards obtained by Red Baron in Japan and had not purported to retain any right to control their resale. However, it is claimed that each of these boards, when put into play, exhibited the following restrictive notice:

> This game is for use in Japan only. Sales, exports, or operation outside this territory may violate international copyright and trademark law and the violator subject to severe penalties.[2]

In the district court, it was Taito's legal theory that it had a valid copyright in the United States for all rights in Double Dragon, including the rights of distribution and public performance, that Red Baron had not obtained a license or other permission to exercise any of those rights, and that Red Baron was therefore infringing Taito's copyright rights when it imported Double Dragon circuit boards into the United States and when it installed the boards in units in its video arcades and made them available to the public for play upon payment of a fee. The district court, however, rejected this theory of the case. It ruled that the "first sale" doctrine, codified in 17 U.S.C. § 109(a),[3] was a limitation on Taito's right to "distribute" the copyrighted work publicly under 17 U.S.C. § 106(3).[4] While

---

1. Taito has apparently adopted the policy of marketing Double Dragon in the United States only as a complete video game unit.

2. Red Baron argued that what, if anything, the circuit board exhibits when first put into play is not in the record. This argument is manifestly frivolous as the circuit board was admitted into evidence in the case. Additionally, Red Baron asserts that the circuit board does not exhibit the restrictive notice. Taito with equal vehemence argues that it does. It is beyond the comprehension of the panel why responsible counsel should be unable to agree as to what a circuit board in evidence does or does not say. Ordinarily the panel would undertake to resolve the dispute, but determining what the circuit board exhibits would require the production of a television monitor and related equipment, and what, if anything, the board says is presumably in Japanese so that an interpreter would also be required. Since our view of the proper disposition of this case does not depend on the presence or absence of the restrictive notice, we will not undertake to resolve this factual issue.

3. § 109. Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord

   (a) Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

4. § 106. Exclusive rights in copyrighted works

   Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

   (1) to reproduce the copyrighted work in copies or phonorecords;

   (2) to prepare derivative works based upon the copyrighted work;

it did not discuss extensively Taito's right to "perform" the copyrighted work pursuant to 17 U.S.C. § 106(4), it apparently applied the first sale doctrine to this right also. According to the district court's ruling, Taito's initial sale in Japan of the circuit boards for Double Dragon extinguished all rights that it had under the copyright laws, including the right of public performance, so that Red Baron did not infringe.

## II.

In appealing, Taito does not contest the correctness of the district court's ruling with respect to Red Baron's right to purchase, import and even to sell Double Dragon circuit boards without Taito's consent. In effect, it concedes for the purposes of this appeal that the first sale doctrine gives Red Baron that right. It argues vigorously, however, that it has a separate and distinct right to "perform" Double Dragon, that it has not conferred this right on Red Baron and that, as a consequence, the latter is infringing Taito's copyright by its activities in making use of the circuit boards available to the public for a fee. This argument requires us to consider first whether Red Baron's use of Double Dragon constitutes a public performance within the meaning of § 106(4), and if so to consider next whether the first sale doctrine has any application to the performance right as distinguished from actual ownership of the copyrighted work. We deal with these questions seriatim.

### A. Public Performance.

■■■ We begin with the proposition that the Double Dragon video game is an "audiovisual work" as defined by 17 U.S.C. § 101. To the extent pertinent, the statute provides that "audiovisual works" are

works which "consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices ... together with accompanying sounds, if any, regardless of the nature of the material objects ... in which the works are embodied." In 1986 we concluded, in agreement with other courts of appeals, that video games are copyrightable as audiovisual works, see *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 435–36 (4 Cir.1986); *accord United States v. Goss*, 803 F.2d 638, 641 (11 Cir.1986); *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1012 (7 Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983); *Williams Electronics, Inc. v. Artic Int'l, Inc.*, 685 F.2d 870 (3 Cir.1982); *Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852, 857 (2 Cir.1982), and we abide by that conclusion today.

To "perform" a work and to perform it "publicly" are also defined by the Copyright Act, 17 U.S.C. § 101 et seq. "Perform" is defined to mean:

to recite, render, play, dance, or act [a work], either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.

The definition of a "public" performance is as follows:

To perform ... a work 'publicly' means—

(1) to perform ... it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered....

When we apply these definitions to Red Baron's conduct of its business, we conclude that Red Baron publicly performed

---

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

While 17 U.S.C. §§ 107–118 contain numerous exceptions and limitations on the broad rights granted in § 106, only the first sale doctrine of § 109(a) is relevant to this case.

Double Dragon. When a video game is activated by the insertion of a proper coin, the television monitor displays a series of images and the loudspeaker makes audible their accompanying sounds. *See Williams Electronics*, 685 F.2d at 874 ("there is always a repetitive sequence of a substantial portion of the sights and sounds of the game"); *Stern Electronics*, 669 F.2d at 856. The exhibition of its images in sequence constitutes a "performance" of an audiovisual work. Indeed, it is the sequential showing of its images that distinguishes the "performance" of an audiovisual work from its "display," which is defined as a nonsequential showing of individual images. 17 U.S.C. § 101; *see* H.R.Rep. 94–1476, 94th Cong., 2d Sess. 64, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5677; 2 Nimmer & Nimmer, *Nimmer on Copyright* §§ 8.14[C] at 8–136.3—137, 8.20[A] at 8–246.6 (1988). True, the exact order of images will vary somewhat each time a video game is played depending on the skill of the player, but there will always be a *sequence* of images. As the House Report accompanying the Copyright Act states, although "[t]he showing of portions" of an audiovisual work "must ... be sequential to constitute a 'performance' rather than a 'display' ... no particular order need be maintained." H.R.Rep. No. 94–1476 at 64, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 5677; *see also* 2 *Nimmer on Copyright* § 8.14[C] at 8–137 n. 18. We therefore conclude that the operation of a video game constitutes a performance as that term is defined in § 101.

We also think that the performance of a video game in a Red Baron arcade qualifies as a "public" performance. Under the Act, as we have noted, to perform a work " 'publicly' means," among other things, "to perform ... it at a place open to the public." 17 U.S.C. § 101. There is no real dispute here that Red Baron's video arcades are open to the public; of course, Red Baron's aim is to attract as many members of the public to its arcades as possible. The use of a Double Dragon unit

may be viewed by the player, any persons accompanying him, and any other interested patrons of the video arcade.

Thus our conclusion is that Red Baron caused the public performance of Double Dragon.

**B.    The First Sale Doctrine and the Performance Right.**

■ Red Baron's contention that the first sale doctrine is applicable to the performance right has a certain superficial, logical appeal in this case. Printed circuit boards embodying Double Dragon are not serviceable in and of themselves. They are functional only when they are used in combination with a television monitor, sound reproduction device and a console containing the controls to play the game. It is also a fair inference that there is only a very limited market for Double Dragon for home use. Rather, from the price and the complexity of the combination of items of equipment necessary to play the game, Taito may be fairly said to know that the circuit boards have utility only in the hands of someone who plans to exploit them commercially.[5] Thus, by selling the boards, so the argument runs, Taito must intend to transfer the performance right, or must become estopped to deny that result, or must waive its right to claim infringement.

There is some support for Red Baron's contention. In *Universal Film Mfg. Co. v. Copperman*, 218 F. 577 (2 Cir.), *cert. denied*, 235 U.S. 704, 35 S.Ct. 209, 59 L.Ed. 433 (1914), the Second Circuit held that a copyright owner's sale of a print of a motion picture film conferred on the purchaser and its successors in title to the print the right to perform the motion picture publicly in theatres. And in *United Artists Television, Inc. v. Fortnightly Corp.*, 377 F.2d 872, 882 (2 Cir.1967), *rev'd on other grounds*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), the Second Circuit stated that "a sale does not generally release other exclusive rights, such as the right to copy, although this Court has held

**5.** As stated in the text, Taito claims that it did attempt to limit the performance right geo-

graphically to Japan.

that the sale of a motion picture print conveys the right to perform it in public for profit [citing *Copperman*]." *See also Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 103 (9 Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960) (discussing rule stated in *Copperman* but holding it inapplicable to facts of *Hampton* case).

It may well be that *Copperman* and *United Artists* are distinguishable from the instant case, as Taito argues. *See* 2 *Nimmer on Copyright* § 8.12[D] at 8–132.1 n. 53 (arguing that first sale doctrine was not basis for *Copperman* court's holding with respect to performance right). In any event, from our examination and understanding of the Copyright Act and decisions of the Third Circuit, we are persuaded that the first sale doctrine does not apply to the performance right, that Taito America possesses and retains a valid copyright in the public performance of Double Dragon in the United States, that it has not granted a performance license to Red Baron and that the latter is thus guilty of copyright infringement.

We begin with the statute. Section 106 of Title 17, *see* n. 3 *supra,* grants to the owner of a copyright five separate and distinct rights: (1) to reproduce the copyrighted work, (2) to prepare derivative works based on the copyrighted work, (3) to distribute copies of the copyrighted work to the public by sale, rental, etc., (4) to perform the copyrighted work publicly and (5) to display the copyrighted work publicly. By its very terms, the statute codifying the first sale doctrine, 17 U.S.C. § 109(a), *see* n. 2 *supra,* is limited in its effect to the *distribution* of the copyrighted work. It prohibits the owner of the copyright in a work who has sold a copy of the work to another from preventing or restricting the transferee from a further sale or disposition of the possession of the copy. Thus, by its terms, § 109(a) has no application to the other four rights of a copyright owner, including the right to perform the work publicly. *See* H.R.Rep. No. 94–1476 at 79, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 5693 (discussing interplay between §§ 109(a) and 202) ("the owner of

the ... copy ... cannot ... perform the copyrighted work publicly without the copyright owner's consent").

The limited application of § 109(a) has been fully recognized by the Third Circuit in two decisions that we find persuasive. The first case to be decided by the Third Circuit, *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3 Cir.1984), concerned the operators of video cassette stores which, in addition to renting and selling video cassettes—activities the legality of which was not challenged—also maintained booths where members of the public could view video cassettes upon payment of a fee. The operators had a license to distribute, but no license to perform publicly, from the copyright owner. When sued for infringement, the operators sought to defend their activities under the first sale doctrine. The contention, however, was rejected, the court holding that although the first sale doctrine "prevents the copyright owner from controlling the future transfer of a particular copy once its material ownership has been transferred," *id.* at 159, "[t]he transfer of the video cassettes to the [operators] ... did not result in the forfeiture or waiver of all of the exclusive rights found in section 106," *id.* at 160, so that "[t]he copyright owner's exclusive right 'to perform the copyrighted work publicly' ha[d] not been affected; only its distribution right as to the transferred copy ha[d] been circumscribed." *Id.* (citations omitted).

In *Columbia Pictures Industries, Inc. v. Aveco, Inc.*, 800 F.2d 59 (3 Cir.1986), the court again considered the rental of video cassettes by a proprietor which had obtained the right to distribute from the producers of the films, but, having obtained no performance right, nevertheless exhibited the cassettes in private viewing rooms for a fee. When sued for infringement, the proprietor asserted the first sale defense, but, again, the court soundly rejected it:

[E]ven assuming, *arguendo*, both a waiver by Producers of their Section 106(3) distribution rights and a valid transfer of ownership of the video cassette during the rental period, the first sale doctrine

is nonetheless irrelevant. The rights protected by copyright are divisible and the waiver of one does not necessarily waive any of the others.... In particular, the transfer of ownership in a particular copy of a work does not affect Producers' Section 106(4) exclusive rights to do and to authorize public performances.... It therefore cannot protect one who is infringing Producers' Section 106(4) rights by the public performance of the copyrighted work.

*Aveco*, 800 F.2d at 64 (citing *Redd Horne*, 749 F.2d at 160; *United States v. Powell*, 701 F.2d 70, 72 (8 Cir.1983); and *United States v. Moore*, 604 F.2d 1228, 1232 (9 Cir.1979)).

Other courts and commentators likewise agree that the first sale doctrine has no application to the rights of the owner of a copyright guaranteed by § 106, except the right of distribution. *See Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341, 1344 (9 Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989); *Powell*, 701 F.2d at 72; 2 *Nimmer on Copyright* § 8.12[D] at 8–132; Leibowitz, The Sequential Distribution of Television Programming in a Dynamic Marketplace, 34 Cath.U.L.Rev. 671, 691 (1985); Note, Closing the Book on the Public Lending Right, 63 N.Y.U.L.Rev. 878, 901 & n. 228 (1988); Annotation, I Copyright L.J. 102, 103 (1985); Annotation, V Copyright L.J. 10 (1989).

We have considered Red Baron's other arguments and find them lacking in merit. We hold that Red Baron, not having a performance license from Taito or Taito America, infringed Taito's copyright. We therefore reverse the judgment of the district court and remand the case for further proceedings consistent with the views expressed herein.

REVERSED AND REMANDED.